[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 4, 2008
THOMAS K. KAHN
CLERK

_____

No. 01-17176

_____

D. C. Docket No. 98-00721-CR-JAL

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RUBEN CAMPA,
a.k.a. John Doe 3,
a.k.a. Vicky,
a.k.a. Camilo,
a.k.a. Oscar,
RENE GONZALEZ,
a.k.a. Iselin,
a.k.a. Castor,
GERARDO HERNANDEZ,
a.k.a. Giro,
a.k.a. Manuel Viramontez,
a.k.a. John Doe 1,
a.k.a. Manuel Viramontes,
LUIS MEDINA,
a.k.a. Oso,
a.k.a. Johnny,
a.k.a. Allan,
a.k.a. John Doe 2,
ANTONIO GUERRERO,
a.k.a. Rolando Gonzalez-Diaz,

a.k.a. Lorient,

Defendants-Appellants.

_____

No. 03-11087

_____

D. C. Docket No. 98-00721-CR-JAL

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GERARDO HERNANDEZ,
a.k.a. Giro, a.k.a. Manuel Viramontez,
a.k.a. John Doe 1, a.k.a. Manuel Viramontes,
LUIS MEDINA,
a.k.a. Oso, a.k.a. Johnny, a.k.a. Allan,
a.k.a. John Doe 2,
RENE GONZALEZ,
a.k.a. Iselin, a.k.a. Castor,
ANTONIO GUERRERO,
a.k.a. Rolando Gonzalez-Diaz, a.k.a. Lorient,
RUBEN CAMPA,
a.k.a. John Doe 3, a.k.a. Vicky, a.k.a. Camilo,
a.k.a. Oscar,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

2

**(June 4, 2008)**

Before BIRCH, PRYOR and KRAVITCH, Circuit Judges.

PRYOR, Circuit Judge:

Five agents of the Cuban Directorate of Intelligence who were members of La Red Avispa (in English, "The Wasp Network") challenge their convictions and sentences for their espionage against the military of the United States and Cuban exiles in southern Florida. A special mission of the Cuban network, Operacion Escorpion, lead to the murder of four men when Cuban military jets shot down two private aircraft over international waters in 1996. Each Cuban agent was convicted of espionage charges, and one agent was convicted of conspiracy to murder, following a trial in Miami that lasted more than six months. Our Court, en banc, affirmed the denial of the Cuban agents' motions for a change of venue and a new trial and remanded this appeal to this panel for consideration of the remaining issues. United States v. Campa, 459 F.3d 1121, 1154–55 (11th Cir. 2006) (en banc).

The Cuban agents raise a host of issues on appeal. The Cuban agents challenge rulings about the suppression of evidence from searches conducted under the Foreign Intelligence Surveillance Act, sovereign immunity, discovery of

3

information under the Classified Information Procedures Act, the exercise of peremptory challenges, alleged prosecutorial and witness misconduct, jury instructions, the sufficiency of the evidence in support of their convictions, and several sentencing issues. We conclude that the arguments about the suppression of evidence, sovereign immunity, discovery, jury selection, and the trial are meritless, and sufficient evidence supports each conviction. We also affirm the sentences of two defendants, but we remand in part for resentencing of the other three defendants.

## I. BACKGROUND

Before we address the merits of this appeal, we review four matters. First, we review the relevant facts in the trial record. Second, we review the procedural history in the district court. Third, although we have previously described the details of the trial, Campa, 459 F.3d at 1126–42, we describe the details that are relevant to the issues that are now before this panel. Finally, we review the convictions and sentences of each Cuban agent.

### *A. Facts*

The primary intelligence agency of Cuba, the Directorate of Intelligence, maintained an organization for espionage in South Florida known as La Red Avispa. Gerardo Hernandez, Ruben Campa (also known as Fernando Gozales-

4

Llort), and Luis Medina III (also known as Ramon Labañino-Salazar) were intelligence officers in the Wasp Network. They supervised network agents, including Rene Gonzalez and Antonio Guerrero. Among other things, the Wasp Network reported information to Cuba about the operation of military facilities, political and law enforcement activities, and activities of organizations based in the United States who support a change in the regime of Cuba.

One organization that the Wasp Network targeted is known as "Brothers to the Rescue," which is a Miami-based organization that flew small aircraft over the Florida straits in efforts to rescue rafters fleeing Cuba. Gonzalez and an unarrested codefendant, Juan Pablo Roque, successfully infiltrated the Brothers organization. In January 1996, aircraft of Brothers twice dropped leaflets over Havana. Some of these leaflets contained excerpts from the Universal Declaration of Human Rights of the United Nations.

Because the Cuban government believed that, during some flights, pilots of Brothers intentionally violated Cuban airspace, the Cuban government launched a special mission codenamed "Operation Scorpion" "in order to perfect the confrontation of" the "[counterrevolutionary] actions of [Brothers]." Cuban intelligence officers transmitted encrypted radio messages that directed Hernandez to instruct Gonzalez and Roque to determine the flight plans of Brothers.

5

Hernandez was instructed to inform Cuban intelligence officials when Gonzalez and Roque would be flying in aircraft of Brothers. Gonzalez and Roque were not to fly from Feburary 24 through 27, and they were instructed to use code phrases during radio communication with Cuban air traffic control if they could not avoid flying on those dates.

On February 24, 1996, three aircraft of Brothers flew toward Cuba, but two did not return. While the planes were flying away from Cuba in international airspace, Cuban military jets shot down two of the aircraft and killed two pilots, Mario de la Peña and Carlos Costa, and two passengers, Armando Alejandre and Pablo Morales. A third plane, flown by Jose Basulto, the founder and leader of Brothers, escaped.

In addition to his infiltration of Brothers, Gonzalez performed several other functions for the Cuban government under Hernandez's supervision. Gonzalez acted as a fraudulent informant to the Federal Bureau of Investigation. He monitored the activities of other Cuban-American organizations in Florida, and he sought for his wife, who was also an agent of the Cuban Directorate of Intelligence, the assistance of a Member of Congress to enter the United States.

Medina and Campa also engaged in other activities. Medina and Campa constructed false identities, which they corroborated with numerous fraudulent

6

identification documents such as United States passports. Medina and Campa supervised attempts by other agents to penetrate the Miami facility of Southern Command, which plans and oversees operations of all military forces of the United States in Cuba, Latin America, and the Caribbean.

Under the supervision of Medina, Campa, and Hernandez, Guerrero obtained employment as a laborer at the Key West Naval Air Station. Guerrero sent his supervisors frequent and detailed reports about the movement of aircraft and military personnel, and comprehensive descriptions of the layout of the facility and its structures. Guerrero reported on the renovations of buildings that were to be used for top-secret activities, and he was urged to determine the purpose for which new top-secret facilities would be used.

## B. Procedural History

Much of the evidence that the government introduced at trial was obtained through searches that were conducted under the Foreign Intelligence Surveillance Act, 50 U.S.C. §§ 1801–1845 (2000), and approved by the court created by that Act. Campa moved to suppress this evidence and argued that the government had failed to adhere to the requirements of the Act. After the Attorney General filed an affidavit that stated that an adversary hearing on the motion to suppress would harm national security, the district court reviewed the motion and affidavit in

7

camera. <u>See</u> 50 U.S.C. § 1806(f). The district court denied the motion to suppress.

Before trial, the government requested and received an ex parte hearing under section four of the Classified Information Procedures Act, which allows the district court to permit the government to provide substitutes in place of classified information that would otherwise be discoverable. 18 U.S.C. app. 3 § 4. The district court denied defense counsel's request to participate in this hearing. After the trial ended, the defendants argued that the district court did not have the authority to hold the hearing and moved to have the records of the hearing unsealed. The district court denied this motion.

Before trial, the defendants requested a change of venue. The district court denied this request. Before, during, and after the trial, the defendants challenged the fairness of the proceedings and sought new trials. They argued that, because of the pervasiveness of anti-Castro sentiment in the area, it was impossible for the defendants to receive a fair trial in Miami-Dade County. The defendants argued that the fairness of the trial was further undermined by prosecutorial misconduct that occurred during the trial and by statements made by Jose Basulto, a defense witness, which we describe below.

During the jury selection process, the government used nine of its eleven peremptory challenges. The defendants objected to seven of these challenges and

argued that the government excluded the jurors because they were black. The district court asked the government to provide a race-neutral reason for each challenged strike, and the court found that the reasons proffered by the government were race neutral. The jury that was seated included three black jurors and one black alternate juror.

After the government closed its case, Hernandez moved to dismiss the murder conspiracy count. He argued that the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602–1611, deprived the court of jurisdiction. The district court disagreed and denied the motion.

*C. Trial and Closing Arguments*

The defendants were charged in a 26-count indictment. They were convicted after a jury trial that lasted more than six months. We described the details of the indictment and the trial in our en banc opinion. 459 F.3d at 1127–42.

During the course of the trial, attorneys for the government and witnesses made several statements that the defendants allege were improper. In response to our request at oral argument, defense counsel filed a chart that listed each instance of alleged misconduct, whether an objection was raised, and the response by the court. The chart includes several allegations that were not raised in the initial briefs of the defendants, but any issues arising out of these allegations were

9

abandoned.  See United States v. Levy, 416 F.3d 1273, 1275 (11th Cir. 2005) ("[P]arties cannot properly raise new issues at supplemental briefing . . . ." (quoting United States v. Nealy, 232 F.3d 825, 830 (11th Cir. 2000)).  Because we address the allegations of misconduct that the defendants raised in their initial briefs, we describe those facts that give rise to these allegations.

The government on several occasions asked questions of witnesses and otherwise referred to the presence of military facilities in Fayetteville, North Carolina, where Campa once lived.  The district court instructed the government to avoid this line of questioning because the government had presented no evidence that connected Campa to those facilities.  After counsel for the government persisted with this line of comments and questions and defense counsel objected, the court instructed the jury that the suggestion "that Mr. Campa's presence in North Carolina was related to a military installation" was "improper" and "to completely disregard" it.  The government again connected Campa with military bases in Fayetteville in its closing argument, but the district court sustained Campa's objection to the remarks by the government.

We described in our en banc opinion as follows an instance of misconduct by a witness, Jose Basulto:

During the  defendants' case, Hernandez called as a hostile witness Jose Basulto, founder of Brothers to the Rescue and the pilot

10

of the only plane that escaped the Februrary 24, 1996, shootdown. After a series of questions about Basulto's travel outside of the United States, in which Hernandez's counsel suggested that Basulto had attempted to smuggle weapons into Cuba, Basulto retorted, "Are you doing the work of the intelligence government of Cuba [?]" . . . The court struck Basulto's remark, admonished him, and instructed the jury to disregard the comment, noting that the remark was "inappropriate and unfounded" and that Hernandez's counsel was properly providing a "vigorous defense for his client."

Campa, 459 F.3d at 1138 (footnotes omitted) (alteration in original).

During closing arguments, the government uttered several statements that the defendants now challenge. In reference to the shootdown, the government said, "What kind of justification is that to shoot people out, or in [defense attorney] Mr. McKenna's word, the final solution, I heard that word before in the history of mankind." In his closing argument, Mr. McKenna had stated that "finally, somebody in a command bunker was given authority to exercise the final option and the final option was exercised," but there was no reference to the "final solution" in Mr. McKenna's closing argument. The government said that the Cuban Directorate of Intelligence sponsored "book bombs," "threats," and "sabotage," and that they used the identities of "dead babies" to construct false identification documents. The government argued, "My God, these guys are spies" "bent on the destruction of the United States of America" and said that Campa was sent "to destroy the United States." The government also said that the

11

date of the shootdown, "February 24, 1996[,] like December 7, 1941[,] is a day that will live in the hearts and minds of these families, these four families forever destroyed." The defendants did not object to any of these statements in closing arguments.

After defense counsel mentioned in closing argument that counsel was appointed and said that "[w]e are working and serving the [C]onstitution of the United States," the government said that the defendants "forced us to prove their guilt beyond a reasonable doubt" and that the defendants who were "bent on destroying the United States" received "able counsel who argued every point and cross-examined our witnesses," "paid for by the American taxpayer." The defendants objected to these arguments. Campa also objected to the statement that the court "takes into account all other factors that may be relevant for what would be the appropriate sentence," which the government made in closing argument after Campa's attorney said that Campa is "looking at ten years in prison." The district court sustained all these objections.

*D. Convictions and Sentences*

After the trial, Hernandez was convicted of 13 counts: one count of conspiracy to gather and transmit national-defense information, 18 U.S.C. § 794(c); eight counts of acting as an agent of a foreign government without

notifying the Attorney General, 18 U.S.C. § 951, and one count of conspiracy to do so, 18 U.S.C. § 371; two counts of fraud and misuse of documents, 18 U.S.C. § 1546(a); one count of possession with intent to use five or more fraudulent identification documents, 18 U.S.C. § 1028(a)(3); and one count of conspiracy to murder, 18 U.S.C. § 1117. Hernandez was sentenced to concurrent terms of life imprisonment on the counts of conspiracy to murder and conspiracy to gather and transmit national defense information. On the other counts, Hernandez was sentenced to shorter terms of imprisonment, which run concurrently with one another and with his life sentences.

Campa was convicted of five counts: two counts of acting as an agent of a foreign government without notifying the Attorney General, 18 U.S.C. § 951, and one count of conspiracy to do so, 18 U.S.C. § 371; one count of fraud and misuse of documents, 18 U.S.C. § 1546(a); and one count of possession with intent to use five or more fraudulent identification documents, 18 U.S.C. § 1028(a)(3). He was sentenced to a total of 228 months of imprisonment.

Medina was convicted of 10 counts: four counts of acting as an agent of a foreign government without notifying the Attorney General, 18 U.S.C. § 951, and one count of conspiracy to do so, 18 U.S.C. § 371; one count of conspiracy to gather and transmit national-defense information, 18 U.S.C. § 794(c); two counts

13

of fraud and misuse of documents, 18 U.S.C. § 1546(a); one count of making a false statement in a passport application, 18 U.S.C. § 1542; and one count of possession with intent to use five or more fraudulent identification documents, 18 U.S.C. § 1028(a)(3). Medina was sentenced to life imprisonment on the conspiracy charge. On the other charges he was sentenced to shorter terms of imprisonment that run concurrently with his life sentence.

Rene Gonzalez was convicted of two counts: one count of acting as an agent of a foreign government without notifying the Attorney General, 18 U.S.C. § 951, and one count of conspiracy to do so, 18 U.S.C. § 371. He was sentenced to five years of imprisonment on the conspiracy count and a consecutive term of ten years of imprisonment on the substantive count.

Antonio Guerrero was convicted of three counts: one count of acting as an agent of a foreign government without notifying the attorney general, 18 U.S.C. § 951, and one count of conspiracy to do so, 18 U.S.C. § 371; and one count of conspiracy to gather and transmit national-defense information, 18 U.S.C. § 794(c). Guerrero was sentenced to life imprisonment for conspiracy to gather and transmit national-defense information, 18 U.S.C. § 794(c). For each of the other counts, Guerrero was sentenced to shorter  terms of imprisonment, which run concurrently with Guerrero's life sentence.

## II. STANDARDS OF REVIEW

The multiple issues in this appeal are governed by several standards of review. We review the denial of a motion to suppress evidence obtained under the Foreign Intelligence Surveillance Act de novo, see United States v. Squillacote, 221 F.3d 542, 554 (4th Cir. 2000), but our scope of review is no greater than that of the court that approved the searches and surveillance, United States v. Badia, 827 F.2d 1458, 1463 (11th Cir. 1987). We review de novo the interpretation of the Classified Information Procedures Act, See United States v. Gilbert, 130 F.3d 1458, 1461 (11th Cir. 1997), but we review discovery rulings for abuse of discretion, see United States v. Quinn, 123 F.3d 1415, 1425 (11th Cir. 1997).

We review the denial of a motion for a mistrial based on improper testimony for abuse of discretion. United States v. Mendez, 117 F.3d 480, 484 (11th Cir. 1997). Allegations of prosecutorial misconduct present mixed questions of law and fact that we review de novo. United States v. Noriega, 117 F.3d 1206, 1218 (11th Cir. 1997). We review jury selection under Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986), de novo, but we review underlying factual findings for clear error. United States v. Allen-Brown, 243 F.3d 1293, 1296–97 (11th Cir. 2001). We review a determination whether participation by a foreign state in litigation is so extensive as to waive a defense of sovereign immunity for abuse of

15

discretion.  Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A., 727 F.2d 274, 278 (2d Cir. 1984); Restatement (Third) of Foreign Relations Law § 456 reporters' note 4 (1987).

We review jury instructions de novo to determine whether they misstate the law or mislead the jury to the prejudice of the party who objects to them.  United States v. Grigsby, 111 F.3d 806, 814 (11th Cir. 1997).  If the instructions accurately reflect the law, the district court enjoys "wide discretion as to the style and wording employed in its instruction[s]."  Bogle v. McClure, 332 F.3d 1347, 1356 (11th Cir. 2003).  We review the sufficiency of the evidence de novo and view the evidence in the light most favorable to the government with all reasonable inferences and credibility choices made in favor of the government to determine whether a reasonable jury could convict.  United States v. Khanani, 502 F.3d 1281, 1293 (11th Cir. 2007); United States v. Keller, 916 F.2d 628, 632 (11th Cir. 1990).  We review the application of the Sentencing Guidelines de novo, but we review the factual determinations of the district court for clear error.  United States v. Bradford, 277 F.3d 1311, 1316 (11th Cir. 2002).

### III. DISCUSSION

The defendants present several arguments about the procedural rulings made by the district court and the jury instructions, and each defendant challenges the

16

sufficiency of the evidence in support of his convictions and his sentence. We first discuss the five procedural issues: (1) whether the district court erred when it denied the defendants' motion to suppress under the Foreign Intelligence Surveillance Act; (2) whether the district court erred about the discovery of classified information; (3) whether the district court was required to grant a new trial or declare a mistrial based on alleged prosecutorial and witness misconduct; (4) whether the government exercised its peremptory challenges to prospective jurors on the basis of race; and (5) whether the Foreign Sovereign Immunities Act deprived the court of jurisdiction of the charges against Hernandez. We then turn to the three issues about the jury instructions: (1) whether the district court instructed the jury erroneously about the offense of acting as a foreign agent without notifying the Attorney General; (2) whether the district court erred when it declined to instruct the jury on the defense of necessity; and (3) whether the district court instructed the jury erroneously about Hernandez's murder-conspiracy charge. We then address the sufficiency of the evidence in support of each defendant's conviction. Finally, we address whether the district court correctly sentenced each defendant.

### A. The District Court Did Not Err When It Denied the Defendants' Motion to Suppress.

Hernandez, Medina, Campa, and Guerrero argue that the district court erred

17

by denying their motion to suppress evidence obtained from searches and surveillance conducted under the Foreign Intelligence Surveillance Act. 50 U.S.C. §§ 1801–1845 (2000). Although the defendants concede that they do not know why the searches and surveillance were approved by officials in the executive branch and the FISA Court, whether the district court determined that the searches and surveillance were for proper purposes, and whether the minimization procedures of the Act were met, the defendants argue that the searches did not comply with the Act. Because only Campa challenged this evidence in the district court, we review the arguments of his codefendants for plain error. See United States v. Gray, 626 F.2d 494, 501 (5th Cir. 1980). In 2001, after the searches were approved, Congress amended the Act and relaxed some of its standards, but we assume that the more stringent standards imposed by the earlier version of the Act governed the applications in this appeal. See United States v. Hammoud, 381 F.3d 316, 333 n.6 (en banc) (4th Cir. 2004), vacated and remanded, 543 U.S. 1097, 125 S. Ct. 1051, opinion reinstated in part, 405 F.3d 1034 (4th Cir. 2005). No plain or other error occurred.

The district court must grant a motion to suppress the fruits of a search or surveillance if it determines that the search or surveillance "was not lawfully authorized or conducted." 50 U.S.C. §§ 1806(g), 1825(h) (2000). An application

18

for a search or surveillance under the Act must contain certifications by a designated official of the executive branch, such as the Director of the Federal Bureau of Investigation, that the information sought is foreign-intelligence information, 50 U.S.C. §§ 1804(a)(7)(A), 1823(a)(7)(A); the purpose of the searches and surveillance is "to obtain foreign intelligence information," 50 U.S.C. §§ 1804(a)(7)(B), 1823(a)(7)(B); and the information sought cannot "reasonably be obtained by normal investigative techniques," 50 U.S.C. §§ 1804(a)(7)(C), 1823(a)(7)(C). The certification also must designate the "type of foreign intelligence information being sought," 50 U.S.C. §§ 1804(a)(7)(D), 1823(a)(7)(D); and include a statement that describes the basis for the certifications that the information sought is the type designated and that the information could not reasonably be obtained by normal investigative techniques, 50 U.S.C. §§ 1804(a)(7)(E), 1823(a)(7)(E).

When, as here, the applications contain the required certifications, they are subject "only to minimal scrutiny by the courts." Badia, 827 F.2d at 1463; United States v. Duggan, 743 F.2d 59, 77 (2d Cir. 1984). The reviewing court has no greater authority to review the certifications of the executive branch than the FISA court has. Badia, 827 F.2d at 1463. We have explained that, in the absence of a prima facie showing of a fraudulent statement by the certifying officer, procedural

19

regularity is the only determination to be made if a non–United States person is the target.  Id. (quoting H.R. Rep. No. 95-1283, pt. 1, at 92–93 (1978)).  The defendants have not identified a fraudulent statement, but at least one of the targets of the searches and surveillance, Guerrero, is a "United States person" because he is a citizen, 50 U.S.C. § 1801(i).

Because a United States person was a target, we must determine whether at least some of the certifications in the application are clearly erroneous.  When we make this determination, we review the statement contained in the application of the basis for the certifications and any other information furnished in connection with the application.  50 U.S.C. § 1824(a)(5).  Our independent review of all the applications satisfies us that the certifications were not clearly erroneous, so we need not decide whether the other defendants are United States persons or whether the clearly erroneous standard of review applies to them.

The defendants argue that the searches were conducted for purposes not allowed under the Act, but we disagree.   A designated executive official certified that the purpose of each search and surveillance was "to obtain foreign intelligence information," 50 U.S.C. §§ 1804(a)(7)(B), 1823(a)(7)(B).  We have reviewed the information contained in the applications and conclude that each certification is not clearly erroneous.

The defendants next argue that, with respect to surveillance, the government "may have" violated the procedures that FISA requires to minimize the "acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons." See 50 U.S.C. §§ 1801(h), 1804(a)(5), 1823(a)(5). The defendants base this argument on a factual finding by another court in an unrelated case, which in turn was based on concessions made by the government that it had erred in several applications and had violated its own rules about information sharing. See In re All Matters Submitted to the Foreign Intelligence Surveillance Court, 218 F. Supp. 2d 611, 620–21 (FISA Ct.), rev'd on other grounds, In re Sealed Case, 310 F.3d 717 (FISA Ct. Rev. 2002). These findings tell us nothing about the searches or surveillance at issue in this appeal, and they do "not establish that the government failed to appropriately minimize surveillance." Hammoud, 381 F.3d at 334.

Finally, Campa argues that the evidence against him must be suppressed because the government did not know of his existence or identity when it submitted applications under the Act. This argument fails. The applications named other defendants as targets, and, as the Court of Appeals for the Second Circuit has explained, when "the proper preconditions are established with respect to a particular target, there is no requirement in FISA that all those likely to be

21

overheard engaging in foreign intelligence conversations be named." <u>Duggan</u>, 743

F.2d at 79.

### B. The District Court Did Not Err In Its Rulings About the Discovery of Classified Information.

Hernandez, Medina, Campa, and Guerrero challenge the manner in which

the district court managed the discovery of classified information by the defense.

They present three arguments: (1) the district court should not have held an ex

parte hearing under section four of the Classified Information Procedures Act, 18

U.S.C. app. § 4; (2) the court should have unsealed the records of that hearing after

the trial; and (3) the government used the Act to violate its discovery obligations

under Federal Rule of Criminal Procedure 16. These arguments fail. We address

each argument in turn.

The district court did not err when it held an ex parte hearing under section

four of the Act. Although it does not expressly provide for a hearing, section four

"contemplates an application of the general law of discovery in criminal cases to

the classified information area," <u>United States v. Yunis</u>, 867 F.2d 617, 621 (D.C.

Cir. 1989). The broad authority of the district court to regulate discovery includes

the power to hold hearings. <u>See, e.g.</u>, Fed. R. Crim. P. 16(d); 2 Charles Alan

Wright, <u>Federal Practice and Procedure</u> § 258 (3d ed. 2000). Nothing in section

four circumscribes this power. As the Ninth Circuit has explained, "a hearing is

appropriate if the court has questions about the confidential nature of the information or its relevancy." United States v. Klimavicius-Vilovia, 144 F.3d 1249, 1261 (9th Cir. 1998). The district court did not abuse its discretion when it held a hearing.

The district court also did not err by holding the hearing ex parte. Section four, which concerns only "[d]iscovery of classified information by defendants," 18 U.S.C. app. 3 § 4, expressly calls for an "ex parte showing." "[W]hile these statutes specify written submissions, they do not rule out hearings in which government counsel participate." Klimavicius-Viloria, 144 F.3d at 1261. When the discovery obligations of the government would otherwise require it to disclose documents that contain classified information, section four allows the district court to permit the government either to redact the classified information or to substitute a summary or a statement of factual admissions in place of the classified documents. 18 U.S.C. app. 3 § 4. If the government provides adequate redacted documents or substitutions and obtains the permission of the district court, section four gives the government the right to keep defense counsel from seeing the original documents. The right that section four confers on the government would be illusory if defense counsel were allowed to participate in section four proceedings, because defense counsel would be able to see the information that the

23

government asks the district court to keep from defense counsel's view.  See United States v. Mejia, 448 F.3d 436, 457–58 (D.C. Cir. 2006); H.R. Rep. No. 96-831, pt. 1, at 27 n.22 (1980) ("[S]ince the government is seeking to withhold classified information from the defendant, an adversary hearing with defense knowledge would defeat the very purpose of the discovery rules.").

The defendants argue that the ex parte hearing prejudiced them and violated their due-process rights, but we disagree.  Ordinarily, the government alone determines whether material in its possession must be turned over to a defendant.  When the defendant requests exculpatory material under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), for example, "the government decides which information must be disclosed."  United States v. Jordan, 316 F.3d 1215, 1252 n.81 (11th Cir. 2003) (citing Pennsylvania v. Ritchie, 480 U.S. 39, 59, 107 S. Ct. 989, 1002 (1987)) .  "Unless the defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final."  Id. (quoting Ritchie, 480 U.S. at 59, 107 S. Ct. at 1002) (internal quotation marks omitted).  In contrast with this ordinary rule of unreviewability, neither the decision of the prosecutor nor the decision of the district court, under section four, is final.  Any information that the government withholds under section four must be replaced with redacted documents or

substitutes. A defendant can examine these redacted documents and substitutes and, if he believes that they are inadequate, move for an order compelling discovery. Fed R. Crim. P. 16(d). The defendants do not argue that this remedy was either inadequate or unavailable to them. We conclude that the district court did not abuse its discretion by holding an ex parte hearing.

The defendants next argue that the district court erred when it declined to unseal the records of its ex parte hearing after the trial, but again we disagree. Section four requires the statement of the government to be "sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal." 18 U.S.C. app. 3 § 4. The statute has no provision for the unsealing of this statement or other sealed records. The right of the government to keep some classified information from defense counsel would be ineffective if, after the trial, the government had to expose the very information that a court ruled the government had a right to keep secret before the trial. The district court did not err when it declined to unseal the records.

Finally, the defendants argue that the government used the Act to violate its discovery obligations under Federal Rule of Criminal Procedure 16 by withholding classified documents and tangible items that were seized from the defendants. This argument also fails. The defendants' bare assertion that they did not receive

25

unspecified information does not establish a discovery violation. See Jordan, 316 F.3d at 1250. The defendants are entitled to discovery of these items upon a motion under Federal Rule of Criminal Procedure 16(a)(1)(E), see Jordan, 316 F.3d at 1250, and if the government has not provided adequate substitutes under section four of the Act. The defendants do not argue either that they filed a motion under Rule 16(a)(1)(E) or that the government failed to provide adequate substitutes under section four, and they do not identify any error in a discovery ruling by the district court. If the government was required to disclose more about the information seized from the defendants, then the defendants who earlier possessed that information should have been able to explain to the district court why the disclosure was inadequate. Without more, we cannot say that the government violated its discovery obligations.

### C. The District Court Did Not Err When It Declined to Order a New Trial or a Mistrial.

Hernandez, Medina, Campa, and Guerrero challenge statements made by a witness and by the government during the trial and statements of the government during closing arguments. The defendants argue that the statements improperly appealed to "the fears and passions of the jury" and require a new trial. We disagree.

The parties dispute whether we resolved this issue in our en banc decision,

26

when we affirmed the denial of the defendants' motions for new trials under Federal Rule of Criminal Procedure 33. Campa, 459 F.3d at 1153. In its order denying the motions, the district court addressed two separate arguments: (1) that the venue was prejudicial; and (2) that the government engaged in prejudicial misconduct. The district court addressed the statements of the government during trial and closing argument that connected Campa with military bases in North Carolina and other closing arguments by the government that the defendants contend were improper. The district court found no prejudicial misconduct, and we affirmed.

The decision of the en banc Court resolved these issues of prosecutorial misconduct. We explained that "the prosecution's closing arguments did not prejudice the defendants because the court granted the defendants' objections and specifically instructed the jury to disregard the improper statements. These alleged incidents of government misconduct 'were so minor that they could not possibly have affected the outcome of the trial.'" Id. (quoting United States v. Alvarez, 755 F.2d 830, 859 (11th Cir. 1985)). Because our en banc Court expressly decided this issue, we will not reconsider it. See Hester v. Int'l Union of Operating Eng'rs, 941 F.2d 1574, 1581 n.9 (11th Cir. 1991).

Our en banc decision also resolved any issue of witness misconduct by Jose

Basulto. The misconduct of a witness does not require the district court to "vitiate the trial" in the absence of prejudice, Spach v. Monarch Ins. Co. of Ohio, 309 F.2d 949, 953 (5th Cir. 1962); see also 66 C.J.S. New Trial § 29, at 113 (1998) ("[V]olunteered statements by a witness, where prejudicial, may under the circumstances warrant a new trial." (emphasis added)), and no prejudice occurred here. We explained in our en banc decision, "Basulto's comment that Hernandez's counsel was a spy for Cuba did not prejudice the defendants because it was merely a single remark during a seven-month trial by the defense's own witness, which the court struck and instructed the jury to disregard." Campa, 459 F.3d at 1153.

Hernandez argues that the closing argument by the government prejudicially misstated its burden of proof for the count of murder conspiracy. Contrary to the argument of the government, we did not address this prosecutorial-misconduct argument in our en banc decision. Campa, 459 F.3d at 1126 n.1. We address it now and conclude that it fails.

During closing argument, the government said that an element of the murder-conspiracy charge "requires the proof of the crime occurring in international airspace" and that the government "has proven that the shootdown occurred in international air space." The government also said, "[T]he United States must prove there was a conspiracy to kill[,] and we have proven the

28

conspiracy to kill." Hernandez objected to each of these statements, and the district court sustained each objection but declined to grant Hernandez's motions for judgment of acquittal and a new trial. The district court did not err.

We subject allegations of prosecutorial misconduct to a "two-part test." United States v. Obregon, 893 F.2d 1307, 1310 (11th Cir. 1990). We "assess (1) whether the challenged comments were improper and (2) if so, whether they prejudicially affected the substantial rights of the defendant." United States v. Castro, 89 F.3d 1443, 1450 (11th Cir. 1996) (citing Obregon, 893 F.2d at 1310). The statements by the government were neither improper nor prejudicial. The jury instructions required proof of one of the overt acts included in the indictment, and one of the overt acts alleged was the killing of individuals in the special maritime and territorial jurisdiction of the United States. The statements by the government were accurate and did not misstate the burden borne by the government.

*D. The Government Did Not Engage In Racial Discrimination In Its Exercise Of Peremptory Challenges.*

The defendants argue that the government violated the Constitution by engaging in a "systematic pattern of striking black jurors." We disagree. The district court did not err when found that the peremptory strikes by the government were not discriminatory.

"Although a prosecutor ordinarily is entitled to exercise permitted

29

peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried, [the Constitution] forbids the prosecutor to challenge potential jurors solely on account of their race . . . ." Batson, 476 U.S. at 89, 106 S. Ct. at 1719 (quoting United States v. Robinson, 421 F. Supp. 467, 473 (D. Conn. 1976)). The procedure for evaluating an objection to a peremptory challenge involves three steps: "(1) the objector must make a prima facie showing that the peremptory challenge is exercised on the basis of race; (2) the burden then shifts to the challenger to articulate a race-neutral explanation for striking the jurors in question; and (3) the trial court must determine whether the objector has carried its burden of proving purposeful discrimination." Allen-Brown, 243 F.3d at 1297.

In response to the defendants' challenges, the district court required the government to give race-neutral explanations for its peremptory challenges. We understand the district court to have ruled implicitly that the defendants had made a prima facie showing of racial discrimination because "a district court cannot ignore the prima facie showing requirement." Id. at 1297. The government stated the reasons for each challenged strike, and the district court found that the proffered reasons were race neutral.

We may affirm the decision of the district court on any ground that finds

support in the record, United States v. Simmons, 368 F.3d 1335, 1342 (11th Cir. 2004), and we conclude that the defendants did not establish a prima facie case of discrimination. Our well-established precedent, United States v. Dennis, 804 F.2d 1208 (11th Cir. 1986), controls this issue. In Dennis, the government exercised some of its peremptory challenges to remove black venire members; it did not use all of its peremptory challenges; and the jury that was seated included two black persons. Id. at 1209, 1211. We concluded, as a matter of law, that there had been no Batson violation:

> It is thus obvious that the government did not attempt to exclude all blacks, or as many blacks as it could, from the jury. Moreover, the unchallenged presence of two blacks on the jury undercuts any inference of impermissible discrimination that might be argued to arise from the fact that the prosecutor used three of the four peremptory challenges he exercised to strike blacks from the panel of potential jurors or alternates.

Id. at 1211.

As occurred in Dennis, the government did not attempt to exclude as many black as it could from the jury. The government chose not to use two of its peremptory challenges at all, and the jury included three black jurors and an alternate black juror. No Batson violation occurred.

*E. The District Court Did Not Err In Its Instructions of the Jury.*

The defendants argue that the district court erred in three of its jury

31

instructions: (1) the instruction about acting as a foreign agent without notifying the Attorney General; (2) the instruction about the offense of conspiracy to murder; and (3) the instruction about the defense of necessity. Each argument fails. We address each argument in turn.

1. Acting as a Foreign Agent Without Notifying the Attorney General

Hernandez, Medina, Campa, Gonzalez, and Guerrero argue that the district court erroneously instructed the jury about the elements of the offense of acting as a foreign agent without notifying the Attorney General. 18 U.S.C. § 951. The defendants argue that the statute requires the government to prove that the defendants knew that they were required to register with the Attorney General and that the district court erred when it declined to instruct the jury on this requirement. We disagree.

The language of the statute is silent about mens rea:

Whoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General if required in subsection (b), shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. § 951(a). The accompanying regulations, promulgated under subsection (b), explain who is required to notify the Attorney General and describe the procedures for notification. See 28 C.F.R. §§ 73.1–.6. These regulations are also

32

silent about mens rea.

The silence of the statute is dispositive: "Where no specific intent element is apparent on the face of the statute, the crime is one of general intent." United States v. Ettinger, 344 F.3d 1149, 1158 (11th Cir. 2003). "[A] defendant need not intend to violate the law to commit a general intent crime, but he must actually intend to do the act that the law proscribes." United States v. Phillips, 19 F.3d 1565, 1576–77 (11th Cir. 1994). We join the Seventh Circuit and hold that section 951 does not require proof that the defendant knew of the requirement to register. See United States v. Dumeisi, 424 F.3d 566, 581 (7th Cir. 2005) ("Knowledge of the requirement to register is not an element of § 951.").

The defendants cite several decisions in support of their argument that the government must prove a heightened mens rea under section 951. These decisions are inapposite because they interpret statutory language that expressly requires a heightened mens rea. See United States v. Adames, 878 F.2d 1374, 1377 (11th Cir. 1989) ("willfully"); United States v. Frade, 709 F.2d 1387, 1391–92 (11th Cir. 1987) ("willfully"); United States v. Hernandez, 662 F.2d 289, 291–92 (5th Cir. Oct. 1981) ("willfully"); United States v. Warren, 612 F.2d 887, 890 (5th Cir. 1980) ("knowingly" and "willfully"). This language is absent from section 951.

The defendants' argument that general principles of criminal law and the

33

doctrine of constitutional doubt require a mens rea of specific intent for section 951(a) also fails. The government was required to prove a mens rea of general intent. The district court instructed the jury that the defendants must have acted "knowingly," and that they must have known "that [they] had not provided prior notification to the Attorney General," to be found guilty under section 951. The defendants' request for an instruction that requires the government to prove that the defendants knew that they were required to register is not an argument for a mens rea requirement but an argument for a heightened mens rea requirement. A heightened requirement has no basis in the statutory language and would be contrary to the ordinary rule, "deeply rooted in the American legal system," Cheek v. United States, 498 U.S. 192, 199, 111 S. Ct. 604, 609 (1991), that ignorance of the law is no defense to a criminal prosecution. The district court did not err when it declined to require proof of more than general intent. See United States v. Knight, 490 F.3d 1268, 1271 (11th Cir. 2007) (a general intent requirement is "sufficient to separate proper conduct from improper actions").

### 2. Conspiracy to Murder

Hernandez argues that the jury instructions allowed the jury to convict him on a finding of fewer elements than required for the charge of conspiracy to murder, but we disagree. The district court gave the instruction that the defense

requested during the charge conference. "It is well established in this Circuit that to invite error is to preclude review of that error on appeal." United States v. Silvestri, 409 F.3d 1311, 1337 (11th Cir. 2005).

Hernandez attempts to evade the invited error doctrine by arguing that other instructions that were given about International Civil Aviation Organization guidelines and arguments that the government made in closing argument somehow lowered the government's burden. This argument fails. Nothing that Hernandez identifies in other instructions or in closing argument suggests that the government bore a burden lower than the burden stated in the murder-conspiracy instruction that the defendants requested.

### 3. Necessity

Guerrero argues that the district court erred when it declined to instruct the jury on the defense of necessity. We disagree. Guerrero did not establish that he was entitled to that instruction.

Guerrero argues that his illegal actions and those of his codefendants were necessary as "a last-resort means of impeding continuing actions and threats—by virulently anti-Castro Cuban-exile groups in south Florida—that had terrorized Cuba." We have explained that a defendant has the burden of establishing his entitlement to an instruction on his theory of defense "separate and apart from

35

instructions given on the elements of the charged offense." United States v. Ruiz, 59 F.3d 1151, 1154 (11th Cir. 1995). This burden is low. "[A] defendant is entitled to have the court instruct the jury on his theory of the case, 'as long as it has some basis in the evidence and has legal support.'" United States v. Presley, 487 F.3d 1346, 1350 (11th Cir. 2007) (quoting United States v. Nolan, 223 F.3d 1311, 1314 (11th Cir. 2000) (per curiam)).

Guerrero has identified no basis in the evidence for a necessity instruction. A defense of necessity requires some evidence that the threat of harm that makes the criminal activity necessary was "unlawful . . . present, imminent, and impending," and that "there was a direct causal relationship between the criminal action and the avoidance of the threatened harm." United States v. Deleveaux, 205 F.3d 1292, 1297 (11th Cir. 2000). Even if we accept Guerrero's interpretation of the facts on appeal, he has not established that the Cuban exile groups posed any imminent threat, nor has he established any causal relation between the conduct that gave rise to his convictions—espionage against the military of the United States—and the avoidance of any harmful activities of Cuban exile groups.

F. *Hernandez Waived Any Defense Under the Foreign Sovereign Immunities Act.*

Hernandez argues that the court did not have jurisdiction over the criminal action against him because he is entitled to sovereign immunity under the Foreign

Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602–11. The Supreme Court has stated that the Act governs "claims of immunity in every civil action" against foreign states. Verlinden B.V. v. Cent. Bank of Nig., 461 U.S. 480, 488, 103 S. Ct. 1962, 1968 (1983). We have stated in dicta that the Act does not address "foreign sovereign immunity in the criminal context," United States v. Noriega, 117 F.3d 1206, 1212 (11th Cir. 1997), but some of our sister circuits disagree about whether the Act affects the jurisdiction of federal courts in criminal actions. Compare Keller v. Cent. Bank of Nig., 277 F.3d 811, 820 (6th Cir. 2002) ("[T]he FSIA grants immunity to foreign sovereigns from criminal prosecution, absent an international agreement stating otherwise."), with Southway v. Cent. Bank of Nig., 198 F.3d 1210, 1214 (10th Cir. 1999) ("If Congress intended defendants . . . to be immune from criminal indictment under the FSIA, Congress should amend the FSIA to expressly so state."). We need not address the availability of sovereign immunity as a defense, under the Act, to the criminal jurisdiction of federal courts if we conclude that Hernandez waived any sovereign immunity.

A foreign state (or its agent or instrumentality) may waive its sovereign "immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). "[A]n appearance . . . in an action, without challenge to the jurisdiction of the court, is a waiver of immunity from jurisdiction to adjudicate that action." Restatement

37

(Third) of Foreign Relations Law § 456(2)(c) & cmt. b (1987). This principle applies whether the party asserts immunity from criminal or civil jurisdiction. Id. § 421(3) & cmt. b.

Hernandez waived any defense of sovereign immunity. Hernandez first appeared before the district court on September 14, 1998, but first raised the defense of sovereign immunity more than two years later at the close of the evidence presented by the government. During this interim, Hernandez appeared before the court on numerous occasions, filed several motions, which included motions to dismiss on other grounds, responded to motions by the government, agreed to a trial date, and appeared at trial. Hernandez's long and active participation in the action waived any defense of sovereign immunity. See id. § 456 reporters' note 4. We recognize that district courts ordinarily "have discretion . . . to determine when the participation of a party in . . . litigation is so extensive as to constitute a waiver." Id.; Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A., 727 F.2d 274, 278 (2d Cir. 1984), but Hernandez's participation was so extensive by the time he first raised the defense that we conclude as a matter of law that he waived any defense, see Richardson v. Fajardo Sugar Co., 241 U.S. 44, 46–47, 36 S. Ct. 476, 477 (1916) (holding that a defendant who appeared, filed answers to an original and several amended complaints, set a trial

38

date, and first raised the defense of sovereign immunity eight months after the action began waived the defense). We do not decide whether the defense would have been available to Hernandez if it had been timely raised. See id.

*G. Sufficient Evidence Supports the Convictions of Each Defendant.*

Gonzalez, Campa, Hernandez, Medina, and Guerrero each argue that the evidence at trial was insufficient to support their respective convictions. We disagree. We address the arguments of each defendant in turn.

1. Sufficient Evidence Supports Gonzalez's Convictions.

Gonzalez argues that the evidence introduced at trial was insufficient to convict him of acting as an agent of a foreign government without notifying the attorney general, 18 U.S.C. § 951, and conspiracy to violate section 951 and to defraud the United States, 18 U.S.C. § 371. We disagree. Sufficient evidence supports each conviction.

Gonzalez concedes that evidence presented at trial established that he and his codefendants acted as "emissaries of the Government of Cuba," but he argues that the evidence is insufficient to establish that he violated section 951(a) and that he conspired to do so because the evidence implies that Gonzalez "was never instructed as to the reporting requirements." Gonzalez's argument is based on a misunderstanding of the law. As we have previously explained, section 951

39

establishes a general intent crime, so the government was required to prove the intent only to do the acts that the law proscribes. Phillips, 19 F.3d at 1576. The government was not required to prove that Gonzalez knew of the registration requirement, so Gonzalez's argument fails.

Gonzalez's argument that the evidence introduced at trial was insufficient to prove three of the overt acts alleged in the indictment also fails. To sustain a conviction for conspiracy, "the Government must prove the existence of an agreement to achieve an unlawful objective, the defendant's knowing and voluntary participation in the conspiracy, and the commission of an overt act in furtherance of it." United States v. Suba, 132 F.3d 662, 672 (11th Cir. 1998). The government does not need to prove that the defendants accomplished the purpose of the conspiracy. "The overt act requirement in the conspiracy statute can be satisfied much more easily. Indeed, the act can be innocent in nature, provided it furthers the purpose of the conspiracy." Iannelli v. United States, 420 U.S. 770, 786 n.17, 95 S. Ct. 1284, 1293 n.17 (1975). "While it is error to submit to the jury an overt act as to which there is a total lack of proof, questions of whether or not a proven overt act is in furtherance of the conspiracy are ordinarily for the jury to decide." United States v. Fontenot, 483 F.2d 315, 322 (5th Cir. 1973) (citations omitted). The government presented sufficient evidence to establish that the overt

40

acts that Gonzalez challenges furthered the conspiracy. We address each challenged act in turn.

The twelfth overt act alleged in the indictment charges that Gonzalez provided Hernandez with a report about a letter that Gonzalez solicited from a "United States Congressional Representative" seeking the admission of Gonzalez's wife into the United States. Gonzalez argues that the evidence introduced in support of this overt act does not prove that Gonzalez's efforts were "tantamount to the interference with any governmental function." Gonzalez's argument misunderstands the law.

The purpose of the conspiracy, as alleged in the indictment, included "sowing disinformation . . . in dealings with United States private and public institutions." The report that Gonzalez sent to Hernandez described his efforts to secure his wife's entry into the United States and explained that Gonzalez's efforts were "designed more to give an appearance, rather than to seek action to have my family leave." A reasonable jury could have found that this report furthered the conspiracy by keeping other members of the conspiracy informed about Gonzalez's efforts. Whether this report actually interfered with any governmental function is irrelevant.

The fifteenth overt act alleged in the indictment, which Gonzalez also

challenges, charges that Gonzalez "met with the FBI in the guise of a cooperating individual." Gonzalez concedes that evidence established that he met with the FBI, and the government introduced communications from Cuba that directed Gonzalez to meet with FBI agents and specifically instructed him how to act during the meetings. The government also introduced reports from Gonzalez to Hernandez that described Gonzalez's meetings with the FBI and opined that Gonzalez's performance was convincing. A reasonable jury could have found based on this evidence that the overt act furthered the conspiracy.

Gonzalez's challenge to the twentieth overt act alleged in the indictment, which charges that Gonzalez reported to Hernandez that "Gonzalez had been flying close to Homestead Air Base with the aim of observing any strange movement," also fails. The government introduced a report in which Gonzalez wrote to Hernandez, "As you told me to do, I have been flying in the vicinity of Homestead Air Base in order to be able to observe any strange movement," and described Gonzalez's observations of aircraft, their movement, and their positioning. The report supports the finding that this overt act furthered the conspiracy.

2. Sufficient Evidence Supports Campa's Convictions.

Campa presents two arguments that the evidence introduced at trial was insufficient to convict him, but both fail. Campa first adopts the arguments of

Gonzalez with respect to his convictions for acting as an agent of a foreign government without notifying the Attorney General and conspiracy to do so. For the reasons we have previously explained, these arguments fail. Campa next argues that the government failed to offer sufficient evidence to support his remaining convictions for fraud and misuse of documents, 18 U.S.C. § 1546(a), and possession with intent to use five or more fraudulent identification documents, 18 U.S.C. § 1028(a)(3). These convictions are based on an allegation that Campa possessed a fraudulent passport. Campa argues that there is insufficient evidence that he possessed this passport, but we disagree.

Two counts of the indictment charged that Campa knowingly possessed a passport that bore Campa's likeness along with the name of someone else. We have explained that "[t]he government need not prove actual possession in order to establish knowing possession; it need only show constructive possession through direct or circumstantial evidence. Constructive possession exists when the defendant exercises ownership, dominion, or control over the item or has the power and intent to exercise dominion or control." United States v. Greer, 440 F.3d 1267, 1271 (11th Cir. 2006) (citation omitted).

The government introduced into evidence a document that appears to be a standard United States passport. The document bears Campa's photograph and the

43

name and signature of "Osvaldo Reina." A government expert testified that the document was a counterfeit passport. An agent of the Federal Bureau of Investigation, who was present when the counterfeit passport was seized, testified that the counterfeit passport was found along with a social security card, Florida driver's license, business cards for an agent of a Spanish book publishing company, and a membership card for a Florida club, all bearing the name of Reina. Some of these other documents also bear Campa's photograph. These items were found hidden inside a concealment device in a notebook that was found in a dresser in Hernandez's apartment.

The government also introduced into evidence an encrypted report found in Campa's residence of "work directives," which contains descriptions of primary, "intermediate," and "reserve" legends. The primary legend is in the name of Ruben Campa and contains biographical data associated with that name. The reserve legend is in name of Osvaldo Reina and includes the biographical data that appears on the counterfeit passport. The government also introduced an "escape plan," found at Campa's residence, which instructs Campa to "change identity, assuming the one in your reserve documentation" in the event of a situation that "might demand an emergency exit from the country."

From this evidence a reasonable jury could have found that Campa had the

power and intent to exercise dominion or control over the counterfeit passport. Campa's argument that "the government proceeded simply on the legally unsustainable theory of possession due to past temporary stay in another's premises" fails. Although mere presence in an area where an item is found is insufficient to support a conviction based on possession of that item, United States v. Rackley, 742 F.2d 1266, 1271 (11th Cir. 1984), the government introduced evidence of much more than presence. A reasonable jury could have inferred from the appearance of Campa's photograph on the passport and accompanying identity documents in the context of the other evidence that Campa was aware of the documents and that they were created for his use. A reasonable jury could have inferred from the instructions that Campa possessed, which contained the Ruben Campa legend that Campa used regularly in addition to the Reina legend, that Campa intended to use the Reina legend if an "emergency exit" became necessary. A reasonable jury could have inferred from Campa's stay at Hernandez's apartment (which Campa concedes) that Campa had access to the counterfeit passport when he needed it. Sufficient evidence supports Campa's convictions.

### 3. Sufficient Evidence Supports the Convictions of Guerrero, Medina, and Hernandez.

The remaining arguments about sufficiency of the evidence pertain to the convictions of Guerrero, Medina, and Hernandez. The relevant offenses are acting

as an agent of a foreign government without notifying the Attorney General and conspiracy to do so, conspiracy to transmit national-defense information, and conspiracy to murder. These defendants were convicted of all except the last charge. Only Hernandez was convicted of that charge.

a. Convictions For Acting as an Agent of a Foreign Government Without Notifying the Attorney General and Conspiracy to Do So

Guererro, Medina, and Hernandez argue that the evidence introduced at trial was insufficient to convict them of acting as an agent of a foreign government without notifying the Attorney General and conspiracy to do so, but we disagree. Each defendant adopts the arguments of Gonzalez with respect to his convictions for these offenses. For the reasons we have previously explained, these arguments fail.

b. Convictions For Conspiracy to Transmit National Defense Information

Guererro, Medina, and Hernandez next argue that their convictions for conspiracy to transmit national-defense information, 18 U.S.C. § 794(c), were not supported by sufficient evidence. We disagree. The government introduced sufficient evidence to support the convictions.

The indictment charges that Hernandez, Medina, and Guerrero conspired "to communicate, deliver and transmit . . . to . . . the Republic of Cuba . . . information relating to the national defense of the United States . . . intending . . . that the same

46

would be used to the injury of the United States and to the advantage of a foreign nation." The defendants concede that they conspired to transmit information to Cuba but argue that the information that they conspired to transmit was not "information relating to the national defense" under section 794. We disagree.

The government introduced sufficient evidence to establish that the defendants conspired to transmit to Cuba "information relating to the national defense." "National defense," the Supreme Court has explained, "is a generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness." Gorin v. United States, 312 U.S. 19, 28, 61 S. Ct. 429, 434 (1941). As the government concedes, in the light of the mens rea requirement of the statute, "information relating to the national defense" under section 794 is limited to information that the government has endeavored to keep from the public. See Gorin, 312 U.S. at 27–28, 61 S. Ct. at 434; Squillacote, 221 F.3d at 575–80; United States v. Heine, 151 F.2d 813, 816 (2d Cir. 1945) (L. Hand, J.).

Joseph Santos, a codefendant of Hernandez, Medina, and Guerrero, testified that he received instructions from Medina to penetrate the facility of the Southern Command in Miami to gather information. Santos testified that there was no limitation placed on the information that he was to gather. Santos also testified

47

that, as part of his training for penetration work, he was instructed that "the most important thing to gather" was "the type of information that is not readily available through conventional means.  It is information that is classified as either restricted, classified, or secret."  The government also introduced correspondence from Medina to Santos that included a chart that described the performance of Medina, Santos, and Santos's wife, Amarylis.  The chart includes a blank entry corresponding to "secret info." of a military nature.  Santos testified that the entry was blank because Santos was "unable to penetrate the Southern Command."

The government also introduced evidence that Guerrero was assigned to gather intelligence from the Naval Air Station at Key West, Florida.  Guerrero discovered that a command post building at the station was being remodeled for use that involves "top secret activities."  The Chief of Naval Operations at the Pentagon testified that the ability to store classified documents at the Key West facility is not made known to the general public.

Correspondence from a Cuban military specialist directed Hernandez, among other things, to instruct Guerrero to obtain "anything else that you can get related to the use of that building."   In a communication to Hernandez, Guerrero described the security features of the structure.  A construction manager at the Department of Defense testified that many of these security features did not appear

on the publicly available floor plan.

The government also introduced correspondence from Medina to Guerrero that includes a chart similar to the chart that summarized Santos's performance. The chart includes a tally of both military and other "secret info." and "public info." The tally includes a positive numeric score for secret military information.

The government also introduced a report from Guerrero to Medina that describes the radio frequency settings that Guerrero observed while he was working on a repair job in the "greenhouse"—an alternate air control tower—at the Key West station. The Chief of Naval Operations at the Pentagon testified that, although the main frequencies that the Navy uses to control civilian and military aircraft are published, Guerrero's report included frequencies that are not published. The naval officer testified that these frequencies are not published because they are used when the Navy does not want the public to know what frequencies the Navy is using to communicate. A reasonable jury could have found based on this evidence that Hernandez, Medina, and Guerrero conspired to transmit to Cuba information relating to the national defense.

The defendants' argue that the evidence proves that they conspired to gather only public information, but we disagree. The defendants contend that they transmitted only public information, so the government failed to prove that they

conspired to do more. This argument is based on a misunderstanding of the law. As we have previously explained, to sustain the charge of conspiracy, the government did not have to prove that the conspirators achieved their goal. See Iannelli v. United States, 420 U.S. at 786 n.17, 95 S. Ct. at 1294 n.17. The government presented ample evidence that the purpose of the conspiracy was to transmit secret information relating to the national defense. That the conspirators were often prevented from achieving their goal is immaterial.

### c. Conspiracy to Murder

Hernandez argues that his conviction for conspiracy to murder, 18 U.S.C. §§ 1111, 1117, is not supported by sufficient evidence. Hernandez argues that his conviction should be reversed because the government failed to prove that he intended the murder to occur within the jurisdiction of the United States, failed to prove that he knew of the object of the conspiracy, and failed to prove that he acted with malice aforethought. Each of these arguments fails. We address each argument in turn.

First, Hernandez argues that the government was required to prove that he intended the murder to occur within the special maritime and territorial jurisdiction of the United States. Hernandez contends that, because the government did not prove that there was a plan to "confront" Brothers in international, as opposed to

Cuban, airspace, his conviction for conspiracy to murder should be reversed. We disagree.

Whether sections 1111 and 1117 require proof that Hernandez intended the murder to occur within the special maritime and territorial jurisdiction of the United States "is a question of statutory construction." Staples v. United States, 511 U.S. 600, 606, 114 S. Ct. 1793, 1796 (1994). The language of the statute, the starting place of our inquiry, id., provides, "Murder is the unlawful killing of human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree." 18 U.S.C. § 1111(a). Section 1111(b) provides, "Within the special maritime and territorial jurisdiction of the United States, [w]hoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life." Section 1117 provides a penalty of "imprisonment for any term of years or for life" for a conspiracy to violate section 1111.

Although the statute explicitly describes the mens rea required for murder, the statute is silent about mens rea that the murder occur in the special jurisdiction of the United States. Ordinarily, we interpret statutes that are silent as to mens rea to require proof of general intent. Ettinger, 344 F.3d at 1158. This rule is subject to an exception when the nature of the statute is such that "congressional silence

51

concerning the mental element of the offense should be interpreted as dispensing with conventional mens rea requirements." Staples, 511 U.S. at 607, 114 S. Ct. at 1798. An exception applies to section 1111.

When a criminal statute is otherwise silent, no proof of mens rea is necessary for elements that are "jurisdictional only." United States v. Feola, 420 U.S. 671, 677 n.9, 95 S. Ct. 1255, 1260 n.9 (1975). As the Supreme Court has explained, "the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute." Id. "[K]nowledge of jurisdictional facts is not required in determining guilt . . . ." United States v. Muncy, 526 F.2d 1261, 1264 (5th Cir. 1976). In Feola, the Court held that a statute that prohibits assault of a federal officer does not require knowledge that the victim is a federal officer because the victim's status as a federal officer is a fact that is jurisdictional only. 420 U.S. at 686, 95 S. Ct. at 1264–65. The Feola Court explained that its holding "poses no risk of unfairness to defendants" because "[t]he situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected." Id. at 685, 95 S. Ct. at 1264.

Hernandez argues that the requirement that the murder occur in the special jurisdiction of the United States is more than a jurisdictional requirement.

52

Hernandez argues that, because the government did not introduce evidence that Cuban law prohibits murder, the jurisdictional language in section 1111(a) distinguishes between potentially legitimate conduct (murder in Cuba under Hernandez's theory) and conduct that is unlawful (murder in the special jurisdiction of the United States). We disagree.

The interpretation of sections 1111 and 1117 is a question of law, United States v. Wilk, 452 F.3d 1208, 1221 n.19 (11th Cir. 2006), that does not depend on whether the government introduced evidence of Cuban law at trial. The discussion in Feola about fairness to defendants was part of an explanation by the Court for its inference that Congress intended the "federal officer" element of the assault statute to be jurisdictional only. Feola, 420 U.S. at 684–85, 95 S. Ct. at 1264. The statutory language did not expressly designate the "federal officer" requirement as jurisdictional. See 18 U.S.C. § 111(a). In contrast, we know that the requirement that a murder occur "[w]ithin the special maritime and territorial jurisdiction of the United States" is jurisdictional based on the plain language of the statute. 18 U.S.C. § 1111(b). Because it expressly defines the mens rea requirement for murder but is silent as to the mens rea requirement for the jurisdictional element, the statute "unambiguously dispenses with any requirement" that the government prove intent that the murder occur in the special jurisdiction of the United States.

53

United States v. Yermian, 468 U.S. 63, 69–70, 104 S. Ct. 2936, 2939–40 (1984) (government need not prove knowledge of federal agency jurisdiction under false statements statute).

We hold that intent that the murder occur within the special maritime and territorial jurisdiction of the United States is not an element of section 1111. Because this intent is not an element of the substantive murder offense, it need not be proved to establish a conspiracy to murder, 18 U.S.C. § 1117:

> [W]ith the exception of the infrequent situation in which reference to the knowledge of the parties to an illegal agreement is necessary to establish the existence of federal jurisdiction, . . . where knowledge of the facts giving rise to federal jurisdiction is not necessary for conviction of a substantive offense embodying a mens rea requirement, such knowledge is equally irrelevant to questions of responsibility for conspiracy to commit that offense.

Feola, 420 U.S. at 696, 95 S. Ct. at 1269; see also Muncy, 526 F.2d at 1264. Hernandez does not argue that facts other than knowledge of the location of the shootdown are insufficient to render his conspiracy a matter of federal concern, and, in Feola, the Court explained that "[f]ederal jurisdiction always exists where the substantive offense is committed in the manner therein described." 420 U.S. at 696, 95 S. Ct. at 1269. The evidence established that the shootdown actually occurred in the special maritime or territorial jurisdiction of the United States.

Second, Hernandez argues that the government did not introduce sufficient

54

evidence to establish that he knew the object of the conspiracy. This argument also fails. Sufficient evidence supports Hernandez's conviction.

According to the indictment, "[i]t was the object of the conspiracy to support and help implement, including with Miami-based information, a plan for violent confrontation of aircraft of Brothers to the Rescue (a Miami-based Cuban exile group . . .), with decisive and fatal results." As we have previously explained, the government had to prove that Hernandez's participation in the conspiracy was "knowing and voluntary." United States v. Suba, 132 F.3d 662, 672 (11th Cir. 1998). The government satisfied its burden.

The government introduced encrypted messages that were broadcast to Hernandez's call sign soon after Brothers dropped over Havana leaflets containing excerpts from the United Nations Declaration on Human Rights in January of 1996. A message dated January 19 said that "superior headquarters approved operacion escorpion in order to perfect the confrontation of [counterrevolutionary] actions of [Brothers]." The message instructed Hernandez that he should obtain information from Gonzalez and Juan Pablo Roque, a codefendant who along with Gonzalez had infiltrated Brothers, about several matters related to flights of Brothers: (1) whether Jose Basulto, the leader of Brothers, would be flying; (2) whether the "activity of dropping of leaflets or violation of air space" was planned;

and (3) whether Roque and Gonzalez would be flying. The message instructed Hernandez to "always specify if agents are flying."

Additional messages to Hernandez stated that it was important for Cuban officials to know when Cuban agents would be on board flights of Brothers. A January 30 message instructed Hernandez that, if Roque and Gonzalez were asked to fly at the last minute without being scheduled, they should find an excuse not to fly. If they could not avoid flying, the message instructed that they should transmit code words over the airplane radio to alert Cuba that the agents were on board. Hernandez relayed these instructions to Gonzalez in correspondence dated February 13. A message transmitted on February 18 instructed Hernandez that "under no circumstances" should Roque or Gonzalez fly with Brothers "on days 24, 25, 26 and 27 . . . in order to avoid any incident of provocation that they may carry out and our response to it. Immediately confirm when you instruct both of them." An expense report from Hernandez states that Hernandez met with Roque on February 22 and Gonzalez on February 23. The shootdown occurred on February 24.

The government offered proof that Hernandez and the Cuban regime considered the operation a success. The government introduced correspondence from Hernandez written after the shootdown that says, "[I]t's a great satisfaction

and source of pride to us that the operation to which we contributed a grain of salt ended successfully." The government also introduced an order from the chief of the Cuban Directorate of Intelligence that granted Hernandez "recognition for the outstanding results achieved on the job, during the provocations carried out by the government of the United States this past 24th of February of 1996."

Hernandez argues that the government did not prove that he received the messages before the shootdown, and he argues that the government called no witnesses to interpret the English translations of the messages. These arguments fail. The government offered ample proof about these matters.

The government introduced evidence that the encrypted messages were transmitted to Hernandez's call sign. The messages were decrypted with materials found at Hernandez's apartment. From this evidence, Hernandez's instructions to Gonzalez, the timing of Hernandez's meetings with Roque and Gonzalez, and the timing of the shootdown, a reasonable jury could have found that Hernandez received the messages that the government introduced.

The government did not need to call an expert witness to interpret the English translations of the messages that Hernandez received because the meaning of the messages was evident in the light of the other evidence that the government presented. The messages describe a plan to "perfect the confrontation" with

57

Brothers aircraft and repeatedly instruct that Cuban agents should avoid flying, especially on February 24, 25, 26, and 27, the days of and after the shootdown. A reasonable jury could have inferred that Hernandez understood that agents were not to fly because the "confrontation" planned with Brothers was a shootdown, which would cause the death of the Cuban agents if they were on board Brothers aircraft. See United States v. Garcia, 405 F.3d 1260, 1269 (11th Cir. 2005) (recognizing that the government may prove that a defendant knowingly and voluntarily joined a conspiracy with circumstantial evidence).

Hernandez argues that his status as a "mere agent" of the Cuban Directorate of Intelligence makes him ineligible for prosecution for "choices made by higher-ups in his government," but we disagree. Because the evidence is sufficient to establish that Hernandez "knew the essential objective of the conspiracy, it does not matter that he did not know all its details or played a minor role in the overall scheme." Suba, 132 F.3d at 672. A reasonable jury could have found based on the evidence that Hernandez knowingly and voluntarily participated in a conspiracy to shoot down aircraft of Brothers.

Third, Hernandez argues that the government failed to prove that Hernandez acted with malice aforethought. We disagree. Sufficient evidence supports this element.

58

"Malice aforethought" is a legal term of art that describes the several mental states that are associated with murder. See George P. Fletcher, Rethinking Criminal Law § 4.3.2, at 270 (2000); James Fitzjames Stephen, Digest of the Criminal Law § 223(a)–(b), at 165–66 (4th ed. 1887). Malice aforethought is an element of both murder under section 1111 and conspiracy to murder under section 1117. See Feola, 420 U.S. at 686, 95 S. Ct. at 1265 ("[I]n order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself."). Malice aforethought ordinarily describes several kinds of murder. See 2 Wayne R. LaFave, Substantive Criminal Law § 14.1(a) 416–18 (2d ed. 2003). This appeal concerns only one kind because the jury was instructed that malice aforethought requires proof that the killing was intentional.

The intent-to-kill form of malice aforethought can be established, as it is here, by proof that the defendant acted with the desire that the death would occur or knowledge "that such a result is substantially certain to occur, whatever his desire concerning that result." Id. at 428. The totality of the evidence, which includes the numerous messages to Hernandez that stressed the importance of warning Cuban agents not to fly and of warning the agents to alert Cuba if they could not avoid flying and Hernandez's statements after the shootdown that the

59

operation "ended successfully," is sufficient to support a finding beyond a reasonable doubt that Hernandez acted with knowledge that the death of the persons on board the planes of Brothers was substantially certain.

The dissent contends that the government failed to introduce sufficient evidence that the object of the conspiracy was a shootdown and that Hernandez agreed to a shootdown in international, as opposed to Cuban, airspace. The dissent acknowledges that the evidence establishes an agreement to "confront" aircraft of Brothers but contends that "there are many ways a country could 'confront' foreign aircraft. Forced landings, warning shots, and forced escorted journeys out of a country's territorial airspace are among them—as are shoot downs." Post at 97.

When the evidence is viewed in the light most favorable to the government, there are at least two reasons to conclude that the government proved that a shootdown was contemplated. First, the instructions that Hernandez received from the Cuban Directorate of Intelligence and relayed to the agents who had infiltrated Brothers support an inference that a shootdown was planned. Second, the correspondence from Hernandez written after the shootdown that recognizes that the operation "ended successfully" establishes Hernandez's guilt.

A reasonable jury could infer that Hernandez recognized that the Cuban Directorate of Intelligence instructed him to specify when Cuban agents were

60

flying, tell the agents not to fly unscheduled or on the days of and around the shootdown, and tell the agents to transmit code words on the radio if they could not avoid flying because the Directorate wanted to ensure that the lives of Cuban agents were not placed in danger. A forced landing, warning shots, or a forced escorted journey would not have placed the agents in danger even if they had been on board the aircraft at the time. A reasonable jury could find that agents were not to fly because a shootdown was planned.

The dissent contends that "[i]t is just as reasonable to conclude that the Directorate of Intelligence did not want its agents flying on those days because of the dangers inherent in any confrontation involving airplanes," post at 97 n.4. This inference, which is at odds with the verdict of the jury, is irrelevant under our standard of review. "The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial," United States v. Molina, 443 F.3d 824, 828 (11th Cir. 2006), but we do not enjoy the same freedom. We "must accept all reasonable inferences . . . made by the jury." Id. The inference the jury drew from the evidence that Hernandez understood that a shootdown was planned is reasonable. Other reasonable inferences the evidence might support are immaterial. Id.

Even if the communications that Hernandez received in advance of the

61

shootdown were not enough, Hernandez's correspondence written afterward that endorsed the shootdown as a success also establishes Hernandez's guilt. The dissent characterizes this correspondence as an "acknowledg[ment of] participation" in a plan to confront Brothers, post at 98, but this statement proves more. Again, we must consider the evidence in the light most favorable to the government and draw all reasonable inferences in its favor, Khanani, 502 F.3d at 1293, and Hernandez's statement need be taken only at face value. Success means "[t]he prosperous achievement of something attempted" or, stated differently, "the attainment of an object according to one's desire." XVII The Oxford English Dictionary 93 (2d ed. 1989). A reasonable jury was entitled to find that, when Hernandez said the operation ended successfully, he meant it. Hernandez and his co-conspirators succeeded when the aircraft were shot down.

The argument by the dissent that the government did not meet its burden because it failed to prove that Hernandez intended for the shootdown to occur in international airspace also fails. The dissent accepts Hernandez's argument that the killing that occurred would not have been unlawful had it occurred in Cuban airspace, but, even if we assume that this argument is correct and that an agreement to commit a justified killing would not be prohibited by the conspiracy statute, 18 U.S.C. § 1117, ample evidence establishes that Hernandez conspired to commit the

62

unlawful murder that actually occurred. Hernandez's statement after the shootdown that the operation ended successfully alone allows a finding by a reasonable jury that the conspirators intended to commit an unlawful killing. If the plan had been to prepare Cuba to defend itself with a justified shootdown over Cuba, then the plan would have failed. What occurred, and what Hernandez called a success, was an unjustified killing in the special maritime and territorial jurisdiction of the United States. A reasonable jury could take Hernandez at his word and find that what occurred was what Hernandez intended. Additionally, an order from the chief of the Cuban Directorate of Intelligence granted Hernandez "recognition for the outstanding results achieved on the job, during the provocations carried out by the government of the United States this past 24th of February of 1996." These statements support a finding that when the planes were shot down, everything, including the unjustified killing in the jurisdiction of the United States, went according to plan. Hernandez's conviction for conspiracy to murder is affirmed.

*H. Sentences.*

Gonzalez, Campa, Hernandez, Medina, and Guerrero each argue that the district court erred when it imposed their respective sentences. Some of these arguments have merit, and others fail. We address the arguments of each

63

defendant in turn.

## 1. Gonzalez's Sentence.

Gonzalez received a sentence of ten years of imprisonment for his conviction for acting as an agent of a foreign government without notifying the Attorney General, 18 U.S.C. § 951, and a consecutive sentence of five years of imprisonment for his conviction for conspiracy to violate section 951 and to defraud the United States, 18 U.S.C. § 371. Gonzalez argues that the district court erred by imposing consecutive sentences for his two counts of conviction. We disagree. The sentence imposed by the district court was not erroneous.

The government and Gonzalez agree that section 951 is "a felony . . . for which no guideline expressly has been promulgated." United States Sentencing Guidelines § 2X5.1 (Nov. 2001). Nor has any Guideline been promulgated for a conspiracy to violate section 951. Because "there is not a sufficiently analogous guideline," id., general purposes of sentencing, 18 U.S.C. § 3553, control the discretion of the district court. U.S.S.G. § 2X5.1.

The district court considered the purposes of sentencing described in section 3553(a)(2) and expressly recognized its obligation to "impose a sentence sufficient, but not greater than necessary, to comply with" those purposes. 18 U.S.C. § 3553(a). The district court selected a sentence of ten years of imprisonment, the

statutory maximum, for the conviction under section 951 and a consecutive sentence of five years of imprisonment, also the statutory maximum, for the conspiracy conviction. Gonzalez's argument that the district court erred by imposing consecutive sentences fails.

Gonzalez argues that the district court should have followed the section of the Guidelines that governs the imposition of a sentence on a defendant subject to an undischarged term of imprisonment, U.S.S.G. § 5G1.3, but we disagree. We have explained that "[a] guideline's meaning is derived first from its plain language and, absent ambiguity, no additional inquiry is necessary." United States v. Mandhai, 375 F.3d 1243, 1247 (11th Cir. 2004). Section 2X5.1 is plain and unambiguous. Where "no guideline expressly has been promulgated" and "there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553(b) . . . control, except that any guidelines and policy statements that can be applied meaningfully . . . shall remain applicable." U.S.S.G. § 2X5.1. Section 5G1.3(b) cannot be applied meaningfully to Gonzalez in this appeal because he is not subject to an undischarged term of imprisonment. The district court has discretion to impose consecutive sentences to comply with the requirements of section 3553. See 18 U.S.C. § 3584(a)–(b); see also U.S.S.G. § 5G1.2(d) (permitting the district court to order consecutive sentences "to the extent necessary to produce a

combined sentence equal to the total punishment").  The district court did not err by selecting consecutive sentences.

Gonzalez also argues that the district court ignored mitigating evidence that he presented.  Gonzalez's sentencing hearing spanned two days, during which the district court heard extensive argument from defense counsel about mitigating factors.   The court considered Gonzalez's arguments that he played a minor role in the offense; that he held steady employment; that policies of the United States toward Cuba are "bizarre"; that Gonzalez's targets in the United States were Cuban exile groups, instead of the government of the United States;  and that Gonzalez had no criminal record.  The court also considered Gonzalez's family connections and that he was separated from his family because he was housed in the special housing unit at the federal detention center.

The district court considered the arguments of counsel made in court and in written objections to the presentence investigation report, along with the purposes of sentencing described in section 3553, when the court imposed Gonzalez's sentence.  We cannot say that the sentence was, as a matter of law, greater than necessary to further those purposes.  The district court did not err.

Finally, Gonzalez argues that the sentencing court ignored the Guideline section that applies to the conspiratorial object of defrauding the United States.

66

U.S.S.G. § 2C1.7. The district court does not appear to have calculated Gonzalez's sentence under section 2C1.7, but we need not consider this argument because the district court imposed the statutory maximum penalty under the conspiracy statute based on the other object—a violation of section 951. The Guideline calculation under section 2C1.7 would not affect Gonzalez's sentence.

## 2. Campa's Sentence

Campa argues that the district court erred when it applied an enhancement of three offense levels under section 3B1.1(b) of the Guidelines based on a finding that Campa was a "manager or supervisor." We agree with Campa. The factual findings by the district court do not support this enhancement.

We have held that "a section 3B1.1 enhancement cannot be based solely on a finding that a defendant managed the assets of a conspiracy." United States v. Glover, 179 F.3d 1300, 1303 (11th Cir. 1999). The enhancement is unwarranted in the absence of a finding that the defendant asserted control or influence over "at least one other participant" in the crime. Id. at 1302. The district court explained that its decision to apply the adjustment under section 3B1.1(b) was "based on [Campa's] managing the assets of the search by [Medina] to obtain death certificates that would subsequently be utilized for false identification documents." Under Glover, this finding is inadequate to support an enhancement under section

3B1.3(b).

The government concedes that the district court acted in "apparent contravention" of Glover, but argues that Campa never raised the issue before the district court and that the error is not reversible. We disagree. Campa preserved the argument and the government has not established that the error was harmless.

Before the district court imposed Campa's sentence, Campa argued that "[t]he [c]ourt in order to sustain this enhancement must find vis-a-vis someone, [Campa] played this managerial role. There is no evidence he had any control over Mr. Medina nor did he have any control or supervisory responsibilities over anyone who has been identified to this court." Campa did not cite Glover in the district court, but he raised this argument in sufficiently "clear and simple language" to preserve the issue. See United States v. Zinn, 321 F.3d 1084, 1087 (11th Cir. 1986).

Because Campa properly preserved this issue, a remand is required unless the government can establish that the error is harmless under the standard stated in Kotteakos v. United States, 328 U.S. 750, 762–66, 66 S. Ct. 1239, 1246–48 (1946). See United States v. Mathenia, 409 F.3d 1289, 1292 (11th Cir. 2005). A sentencing error, under the Guidelines, is harmless if a court considers the proceedings in their entirety and determines that the error did not affect the

68

sentence "or had but very slight effect." Kotteakos, 328 U.S. at 764, 66 S. Ct. at 1248. If we can say "with fair assurance" that the sentence was not "substantially swayed by the error," we may affirm. Id. at 765, 66 S. Ct. at 1248. We have explained that this standard for review of harmless error "is as difficult for the government to meet . . . as it is for a defendant to meet the third-prong prejudice standard for plain error review." Mathenia, 1292 F.3d at 1292.

The government has not satisfied its burden. The government argues that there is evidence that would support a finding that Campa managed another participant, but we cannot say with fair assurance that the district court would have made that finding. As the United States Supreme Court explained, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error." Kotteakos, 328 U.S. at 765, 66 S. Ct. at 1248. Whether Campa managed or supervised one or more participants is a question of fact, and the Kottekos standard does not allow us to assume the role of the factfinder. See id. at 765, 66 S. Ct. at 1246. Remand is necessary to allow the district court to consider whether to apply the enhancement under section 3B1.1 adjustment based on findings other than Campa's management of assets.

Campa also adopts the argument of Medina that the district court erred by increasing his offense level for obstruction of justice and the argument of Gonzalez

69

that the district court erred by imposing consecutive sentences. As we explain elsewhere, these arguments fail. The district court did not err by applying the adjustment for obstruction of justice or by imposing consecutive sentences.

## 3. Medina's Sentence

Medina argues that the district court committed three errors when it calculated his sentence: (1) the court selected an incorrect base offense level, which it erroneously adjusted based on offense conduct; (2) the court erred when it enhanced his offense level for obstruction of justice; and (3) the court erred when it declined to depart downward based on his minor role in the offense. We address each argument in turn.

Medina argues that the district court selected the incorrect base offense level for several reasons. First, Medina argues that the district court followed an incorrect Guideline section to compute his base offense level. Section 2X1.1(c) of the Guidelines explains that "[w]hen a[] . . . conspiracy is expressly covered by another offense guideline section, apply that guideline section." The district court applied section 2M3.1, the Guideline applicable to violations of a federal statute, 18 U.S.C. § 794, that expressly covers both the gathering of national defense information to aid a foreign government and conspiracy to do so.

Medina argues that the district court should have applied section 2X1.1(a),

which applies to conspiracies not covered by a specific offense Guideline to determine his base offense level. We disagree. Our precedent, United States v. Thomas, 8 F.3d 1552, 1564–65 (11th Cir. 1993), guides our resolution of this issue.

Medina's conspiracy offense is analogous to a conspiracy to violate the Hobbs Act. In Thomas we held that the district court correctly refused to apply section 2X1.1(a) to a Hobbs Act conspiracy because "[a] conspiracy to violate the Hobbs Act is a violation of the Hobbs Act itself." Id. at 1564. Based on the reasoning of Thomas, the district court correctly applied section 2M3.1 because a conspiracy to violate section 794 is also a violation of section 794.

Medina's argument that the district court should not have followed Thomas because the decision from the Second Circuit, United States v. Skowronski, 968 F.2d 242, 250 (2d Cir. 1992), that we found persuasive in Thomas is no longer followed in that Circuit, see United States v. Amato, 46 F.3d 1255, 1261 (2d Cir. 1995), fails. Thomas remains good law in this Circuit, and, in the absence of a contrary opinion of the Supreme Court or of this Court sitting en banc, we cannot overrule a decision of a prior panel of this Court. Main Drug, Inc. v. Aetna U.S. Healthcare, Inc., 475 F.3d 1228, 1230 (11th Cir. 2007). The district court was correct to apply section 2M3.1.

71

Medina next argues that the district court erred when, under section 2M3.1(a)(1), it selected a base offense level of 42, which is appropriate "if top secret information was gathered or transmitted," instead of a base offense level of 37, which is appropriate "otherwise," § 2M3.1(a)(2). We agree with Medina. The district court did not find that top secret information was gathered or transmitted; it based its selection of the base offense level on the finding that the object of the conspiracy was to obtain top secret information. Under section 2M3.1(a)(2), a base offense level of 37 is appropriate based on this finding.

Our precedent in United States v. Chastain, 198 F.3d 1338 (11th Cir. 1999), is instructive on this issue. Chastain involved an enhancement under section 2D1.1(b)(2), which provides, "If the defendant unlawfully imported or exported a controlled substance under circumstances in which an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance, . . . increase by two levels." Id. at 1353 (quoting U.S.S.G. § 2D1.1(b)(2)) (omission in original) (internal quotation marks omitted). The district court enhanced the sentence based upon a finding that the defendants had planned to use a private plane to import narcotics. Id. We reversed. We explained that "[w]hen the language of the guideline is clear, it is not necessary to look elsewhere for interpretation. Here, the language of the guideline clearly contemplates a

72

completed event, an actual importation." Id.

The district court erred. Like the Guideline that we interpreted in Chastain, section 2M1.3 clearly contemplates a completed event: the actual gathering or transmission of top secret information. Because the district court did not find that top secret information was gathered or transmitted, we remand for resentencing.

Medina next argues that the district court erred when it declined to order a consultation with an "authorized designee" of the President so that Medina could take advantage of application note 3, which allows the court to depart from the Guidelines upon a representation by the President that the imposition of a non-Guideline sentence is "necessary to protect national security or further the objectives of the nation's foreign policy." U.S.S.G. § 2M3.1 cmt. n.3. We disagree. Nothing in the Guideline section or the application notes empowers the district court to require the President or his designee to express any view about a sentence.

Medina next argues that the district court erred when it declined to grant a downward departure that "may be warranted" when revelation of "the information at issue" "is likely to cause little or no harm." U.S.S.G. § 2M3.1 cmt. n.2. The district court based its decision not to depart downward on its finding that the object of the conspiracy was to gather or transmit"top secret information" under

section 2M3.1(a)(1).  The district court held that application note 2 is inapposite when 2M3.1(a)(1) applies, because top secret information, by definition, "reasonably could be expected to cause exceptionally grave damage,"  U.S.S.G. § 2M3.1 cmt. n.1.  We do not consider whether a departure under application note 2 was appropriate.  We remand to the district court to consider in the first instance whether a departure is appropriate in the light of our conclusion that section 2M3.1(a)(1) is inapplicable in the absence of a finding that top secret information was gathered or transmitted.

Medina next argues that the district court erred when it applied a two-offense-level upward adjustment for obstruction of justice under section 3C1.1 of the Guidelines.  The adjustment was based on a finding that Medina gave a false name to the magistrate judge at his pretrial detention hearing.  Medina, whose real name is Ramón Labañino, concedes that he "stood by his legend and stated that he was Luis Medina," but argues that his deception was part of the offense, instead of the "investigation, prosecution, or sentencing,"  U.S.S.G. § 3C1.1 cmt. n.1.  He also argues that the evidence did not establish that he had the requisite mens rea or that his conduct significantly hindered the prosecution or investigation of the offense.  Each of these arguments fails.

Section 3C1.1 applies to "obstructive conduct" that "occurred during the

74

course of the investigation, prosecution, or sentencing of the defendant's instant offense of conviction." U.S.S.G. § 3C1.1 cmt. n.1. Medina relies on language in an Eighth Circuit decision that explains that "[s]ection 3C1.1 does not apply to conduct that is part of the crime itself," United States v. Lloyd, 947 F.2d 339, 340 (8th Cir. 1991), and argues that his use of the legend "Luis Medina" before the magistrate judge was part of the crime of espionage. We disagree.

Application note 1 does not exclude from the scope of section 3C1.1 conduct that relates to the offense of conviction. To the contrary, it expressly requires a relationship between the obstructive conduct and that offense or "an otherwise closely related case." See U.S.S.G. § 3C1.1 cmt. n.1(B). The relevant question is whether the obstructive conduct occurred during the course of the investigation, prosecution, or sentencing. Medina's false statement clearly occurred within the scope of application note 1.

Providing a false name to a magistrate at a detention hearing qualifies as obstructive conduct. Application note 4(f) lists "providing materially false information to a judge or magistrate" as an example of the kind of conduct to which section 3C1.1 applies. "[I]f believed," a false name "would tend to influence or affect the issue[s] under determination," by a magistrate judge in a detention hearing. U.S.S.G. § 3C1.1 cmt. n.6. The magistrate judge must

75

consider, among other things, the family ties, financial resources, residence, past conduct, criminal history, record of appearance at court proceedings, and probationary status of the person before the magistrate judge in a detention hearing. See 18 U.S.C. § 3142(g)(3). A false name, if believed, would tend to affect the magistrate judge's assessment of these factors, see United States v. Tran, 285 F.3d 934, 940 (10th Cir. 2002) ("It is plain that [the defendant's] misidentification of himself was an attempt to obstruct or impede the administration of justice, and that this attempt might well have borne fruit at his detention hearing if the court had decided to release him based on his apparent lack of a criminal history."); United States v. Charles, 138 F.3d 257, 267 (6th Cir. 1998); United States v. Berrios, 132 F.3d 834, 840 (1st Cir. 1998); United States v. Mafanya, 24 F.3d 412, 415 (2d Cir. 1994); United States v. Blackman, 904 F.2d 1250, 1259 (8th Cir. 1990).

Medina next argues that the evidence does not establish that Medina acted with the mens rea required under section 3C1.1. This argument is specious. Medina concedes that he deliberately gave a false name to maintain the legend that he had previously adopted for the purpose of deception. This conduct established that Medina "consciously act[ed] with the purpose of obstructing justice." United States v. Burton, 933 F.2d 916, 918 (11th Cir. 1991) (quoting United States v.

76

Stroud, 893 F.2d 504, 507 (2d Cir. 1990)) (internal quotation mark omitted).

Medina next argues that the district court must explain how Medina's conduct significantly hindered the prosecution or investigation of the offense, but this argument misreads the application notes of section 3C1.1. Note 5(a) explains that "providing a false name or identification document <u>at arrest</u>" ordinarily does not warrant application of the adjustment unless "such conduct actually resulted in a significant hindrance to the investigation or prosecution of the . . . offense." U.S.S.G. § 3C1.1 cmt. n.5(a) (emphasis added). Medina's adjustment was based on the provision of a false name to a magistrate judge at a detention hearing. The adjustment was appropriate whether or not a significant hindrance occurred. U.S.S.G. § 3B1.1 cmt. n.4(f).

Finally, Medina argues that the district court erred when it declined to adjust his offense level downward because Medina was a "minimal" or "minor" participant under Guideline section 3B1.2. In support of this argument, Medina says little more than that "[h]e simply was a small cog in a big machine." Medina's argument fails. Medina's role is measured not against the totality of conduct by the Cuban regime, but "against the relevant conduct for which [he] has been held accountable." <u>United States v. Rodriguez De Varon</u>, 175 F.3d 930, 940 (11th Cir. 1999). We cannot say that the district court clearly erred when it

declined to find that Medina was "substantially less culpable than the average participant" in the conduct for which Medina is responsible. U.S.S.G. § 3B1.2 cmt. n.3(A).

### 4. Guerrero's Use Of a Special Skill

Guerrero argues that the district court erred when it found that he "used a special skill[] in a manner that significantly facilitated the commission or concealment of the offense," and applied a two-offense-level adjustment under section 3B1.3 of the Sentencing Guidelines. U.S.S.G. § 3B1.3 Guerrero argues that he did not use a special skill and his skills did not significantly facilitate the commission of the offense. We disagree.

Guerrero argues that his training is indistinguishable from his criminal conduct and inadequate to support a special-skill adjustment, but this argument fails. A "special skill" is "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." U.S.S.G. § 3B1.3 cmt n.3. The district court found that Guerrero was specially trained in radio intelligence, radio and computer encryption and decryption, and civil engineering.

Courts have held that "[t]he skill must be a 'legitimate' skill turned to evil purposes." See Roger W. Haines, Jr. et al., Federal Sentencing Guidelines

78

Handbook 1079 (2007) (footnote omitted).  The Ninth Circuit, for example, has held that "[s]tanding alone, [a defendant's] ability to manufacture methamphetamine cannot be the basis of a special skill enhancement."  United States v. Mainard, 5 F.3d 404, 405 (9th Cir. 1993).  The District of Columbia Circuit followed similar reasoning when it held that proof that the defendant "knew how to commit the base offense of manufacturing PCP" was "insufficient to justify a special skill enhancement under § 3B1.3."  United States v. Young, 932 F.2d 1510, 1515 (D.C. Cir. 1991).

Skills in civil engineering, radio technology, and computer technology are legitimate skills that Guerrero turned to criminal purposes.  See United States v. Malgoza, 2 F.3d 1107, 1110 (11th Cir. 1993) (radio operation); United States v. Prochner, 417 F.3d 54, 62 (1st Cir. 2005) (computer skills); United States v. Sain, 141 F.3d 463, 476 (3d Cir. 1998) (civil engineering).  Unlike skill in the art of methamphetamine or PCP manufacture, which cannot easily be put to legitimate use, Guerrero's skills have legitimate value independent of the criminal activity of which Guerrero was convicted.  The district court did not err by finding that Guerrero possessed a "special skill."

Guerrero also challenges the finding that his skills significantly facilitated the commission of the offense by enabling him to craft and report a mental

79

blueprint of facilities that he observed while working at the Naval Air Station at Key West, but we disagree. We have explained that "significant facilitation" occurs when a "person in the position of trust has an advantage in committing the crime because of that trust and uses that advantage in order to commit the crime." United States v. Barakat, 130 F.3d 1448, 1455 (11th Cir. 1997). This formulation applies when a special skill is involved. The district court could have reasonably found that Guererro, because of his training in civil engineering, had an advantage in composing and transmitting a mental blueprint, and he used that advantage to commit the crime of conspiracy to gather and transmit national defense information.

5. The Sentences of Guerrero and Hernandez

Guerrero and Hernandez both adopt several arguments of Medina. They adopt Medina's arguments that the district court erred when it declined to order a consultation with the President's authorized designee, when it applied section 2M3.1 to determine their base offense level, when it increased their offense level for obstruction of justice, and when it declined to depart downward based on their roles in the offense. As we explained earlier, these arguments fail.

Two of Medina's arguments that Hernandez and Guerrero adopt have merit, but a remand is necessary for Guerrero only. As we explained before, the district

court erred when it applied section 2M3.1(a)(1) instead of section 2M3.1(a)(2) in the absence of a finding that top secret information was gathered or transmitted, and this error undermines the basis for the conclusion by the district court that it did not have authority to depart under application note 2 of section 2M3.1. We remand to allow the district court to resentence Guerrero in the light of our ruling, but we need not remand for resentencing of Hernandez. Because he was sentenced to life imprisonment on his murder-conspiracy conviction, any error in the calculation of Hernandez's concurrent sentence for conspiracy to gather and transmit national-defense information is "irrelevant to the time he will serve in prison." United States v. Rivera, 282 F.3d 74, 77–78 (2d Cir. 2000). Hernandez need not be resentenced because the errors under Guideline section 2M3.1 are harmless with respect to him. See Fed. R. Crim. P. 52(b); Williams v. United States, 503 U.S. 193, 203, 112 S. Ct. 1112, 1120–21 (1992); United States v. Pierre, 484 F.3d 75, 91 (1st Cir. 2007); Rivera, 282 F.3d at 77; United States v. Nguyen, 46 F.3d 781, 783 (8th Cir. 1995); see also United States v. Jones, 28 F.3d 1574 (11th Cir. 1994) (recognizing our discretion to decline to review sentencing errors under the "concurrent sentence doctrine"), vacated, 516 U.S. 1022, 116 S. Ct. 663 (1995), opinion reinstated in part, 74 F.3d 275 (11th Cir. 1996); United States v. Segien, 114 F.3d 1014, 1021 (10th Cir. 1997). But see United States v.

Kincaid, 898 F.2d 110, 112 (9th Cir. 1990) (rejecting the concurrent sentence doctrine and its application to sentencing errors).

## IV. CONCLUSION

We **AFFIRM** the convictions of each defendant and the sentences of Gonzalez and Hernandez.  We **VACATE** the sentences of Campa, Medina, and Guerrero, and **REMAND** for resentencing proceedings consistent with this opinion.

**AFFIRMED** in part, **VACATED** in part, and **REMANDED** in part.

BIRCH, J., specially concurring:

I concur in Judge Pryor's opinion for the court.  As evident from the dissent on the issue of conspiracy to commit murder, this issue presents a very close case. However, given our standards of review with regard to Hernandez's conviction on Count 3, I conclude that the conviction should be affirmed.

I remain convinced, for all the reasons and facts set out in my prior dissent that the motion for change of venue should have been granted.  See United States v. Campa, 459 F.3d 1121, 1155 (11th Cir. 2006)(en banc).  The defendants were subjected to such a degree of harm based upon demonstrated pervasive community prejudice that their convictions should have been reversed.   The Supreme Court has not addressed the law concerning Fed.R.Crim.P. 21 motions for change of venue since Patton v. Yount, 467 U.S. 1025, 104 S. Ct. 2885 (1984).  Given the technological advances and 24-hour news cycle that have become prevalent in our nation since 1984, I respectfully suggest that this case provides a timely and appropriate opportunity for the Court to address the issue of  change of venue in this internet and media permeated century.

Kravitch, Circuit Judge, concurring in part and dissenting in part,

I concur in the majority opinion with the exception of section 3.c. (the court's affirmance of Count 3, conspiracy to commit murder), from which I respectfully dissent. In my view, the Government failed to present evidence sufficient to prove beyond a reasonable doubt that Hernandez agreed to participate in a conspiracy, the object of which was to shoot down BTTR planes over international airspace, resulting in the deaths of several pilots.

## I. Facts

Brothers to the Rescue ("BTTR") repeatedly and knowingly had violated Cuban airspace since 1994. Jose Basulto, BTTR's founder and leader, testified that on April 17, 1994 he flew with Bernadette Pardo—a television news reporter—close to the coast of Cuba. Consistent with BTTR's customary practice, a few other BTTR aircraft accompanied Basulto's plane. The news reporter videotaped the flight and portions were played for the jury.

The videotape showed a Cuban military aircraft "MiG" circle the BTTR planes and fly in front of Basulto's. Basulto radioed the MiG pilots, stating, "On behalf of the Cuban exiles, the group that makes the work of Brothers to the Rescue possible, we wish to Cuba, the Cuban people, the armed forces that you could make freedom for Cuba possible and to do everything you can to bring an

84

end to Castro's regime."  The MiG's pilots did not respond to Basulto's encouragement to defect from Castro's Government and did not fire any shots.

Basulto testified that on the next occasion of knowingly violating Cuban airspace, he flew over a small town where his father had been born near Guantanamo Naval Base and dropped BTTR bumper stickers.  This incursion was on November 10, 1994.  Once again, the Cuban Government did not respond with violence.

On July 13, 1995, BTTR escalated its efforts.  To commemorate Cuba's sinking of a tugboat full of people (ostensibly leaving Cuba) within Cuba's territorial waters a year earlier,  BTTR planned a demonstration in association with Democracia, a related anti-Castro group.  Prior to July 13th, BTTR notified both U.S. and Cuban officials of its plan to commit "civil disobedience" within Cuban territorial waters.  Cuba prepared itself, placing gun boats in the water and preparing MiGs.  The United States State Department issued a public announcement, which Basulto saw, stating that pilots should not violate Cuban airspace.

Despite the warning, on July 13th, BTTR flew four planes into Cuban airspace and Democracia drove a boat (also named "Democracia") into Cuban territorial waters.  Basulto, the pilot in one of the planes, testified that as he

85

approached Cuban airspace, Havana Air Traffic Control told him to leave. He ignored those warnings.

Basulto further testified that MiGs were in the air—passing and circling over him—and he saw gun boats in the water. Basulto dropped a smoke canister out of his window at the point where the tugboat was believed to have been sunk. Then he flew over a Cuban gun boat, dropping leaflets.

He also flew the plane low over downtown Havana for approximately 13 minutes, dropping nearly 20,000 leaflets and religious medals. Basulto testified that he flew over Havana to divert attention away from the Democracia as those on board had notified Basulto via radio that a Cuban gun boat had rammed it.

Despite this run-in with the Cuban military, all participants returned safely to Miami. In an interview with the news media, Basulto told reporters that he "engaged in an act of civil disobedience and I did it to show the Cuban people they could do the same thing."

Following the July 13, 1995 incident, a Cuban official sent a letter to the Federal Aviation Administration ("FAA") notifying the FAA of the "violations of the Cuban aeronautical laws" committed by BTTR that day. The letter stated that the aircraft deviated from the routes described in their flight plans and ignored Cuba's warnings. The letter also stated that these actions "may bring grave

consequences" and asked that American officials "adopt whatever measures are necessary" to avoid "provocation" of Cuban sovereignty. The letter ended with a quotation from a public declaration Cuba released the day after the July 13th airspace violations: "Any craft proceeding from the exterior that invades by force our sovereign waters could be sunk and any aircraft downed."

The United States Department of State then issued a statement warning pilots to avoid penetrating Cuban airspace. The statement quoted the Cuban declaration that any boat from abroad can be sunk and any airplane downed and stated that "[t]he Department takes this statement seriously."

Despite the warnings from both Cuba and the United States, BTTR flew again in January of 1996. Over the course of two flights—on the 9th and 13th—BTTR escalated its efforts even further, dropping nearly 500,000 leaflets over Havana and nearby communities. The parties disputed at trial whether BTTR planes violated Cuban airspace on these flights, but viewing the facts in the light most favorable to the Government—as we must—none of the BTTR planes entered into Cuban airspace in January. According to Basulto, after taking into consideration wind speed and altitude, BTTR dropped these flyers in international airspace calculating that they would drop in or near Havana.

BTTR did not entirely ignore the warnings. In fact, Basulto and other BTTR

87

members specifically contemplated that if they violated Cuban airspace the Cuban military might confront them and force them to land. Before the flight on January 9, 1996, BTTR made a videotape that it left behind in case the pilots did not return. Basulto stated, "If anything happens, being that we might be made to land in Cuba, we would like to clarify that, under pressure, any human being may say anything against his beli[efs]." Arnaldo Iglesias, another BTTR member, stated on the tape that he habitually blinked his eyes and that "[I]n case they were to make us land in Cuba, I'm going to make a great effort not to blink. Which means that what I'm saying, I don't really feel." Billy Schuz, another BTTR member, then told the camera that he would do the opposite: that if captured and forced to land in Cuba, he would "blink continually."

On January 15, 1996—two days after the last leaflet dropping—Basulto appeared via telephone on "En Vivo," a Cuban radio program. Basulto acknowledged responsibility on behalf of BTTR for the leaflet droppings. Portions of the conversation are relevant here:

> [Host 1]: You were not attacked, the planes, nothing, right?
> [Basulto]: That's right. We were not. . . . uh, we have not received any type of, of attack from the Cuban government, up to now it has only been verbal.
>
>                    .    .    .
>
> [Host 1]: [W]hat was the objective sought, that you seek with this, with this action[?]

88

[Basulto]: Several objectives, one of them, the first is to give a message of solidarity.  One of the messages in the flyers says uh, "Not comrades, brothers," which is the same theme we've used before.  Others say: "I am change," implying that the main role for change in Cuba belongs to the Cuban people, who are the ones who have to act to change this regime. . . . All those pamphlets had, in the back, one or more of the chapters of the Universal Declaration of Human Rights, and in the back they also said: "Cuban, fight for your rights." . . . [W]e are urging our people, on the thirteenth of every month, they use, and I say thirteenth of every month because we use it as a reminder of the incident that happened on March thirteenth, the sinking of that boat, which was so tragic, and we use the thirteenth from now on so that on every month, all of us Cubans on the thirteenth do something, uh, some act of opposition, uh, of direct civic action against the government . . . until we are able to gain enough strength to stop that government. . . .

.   .   .

[Host 1]: Basulto, to what do you attribute the fact that the Cuban government did not have, did not have a military response against you, lack of organization, surprise[]?
[Basulto]: That is the same question that our compatriots on the island should asks [sic] themselves when they go to fear the government at a time they plan on doing something against it.  We've been willing to take personal risks for this, they must be willing to do the same.  Let them see that this regime is not invulnerable, that Castro can be penetrated, that many things can be done that are at our disposal.  The thing is that we must, once and for all, do away with that internal police that we carry with us, that we think we're always being watched.  Well, we're asking our people to meditate upon the possible things that can be done there, and for them to carry them out on the thirteenth day of each month.

Basulto's testimony at trial was consistent with his "En Vivo" interview: he wanted his incursions into Cuban airspace to serve as an example to Cubans.  He testified that he wanted to inspire Cubans to imitate his defiance of the Cuban

89

Government and topple Castro's regime.

Also on January 15, 1996, the Cuban Government again sent a letter to the FAA, informing the FAA that two of the same planes that crossed into Cuban airspace in July again crossed into Cuban airspace on January 13th. The letter quoted a public declaration that "Cuba has the necessary measures to guarantee integrity of [its] national territory" and that "violators [of Cuban airspace] should also be prepared to face the consequences." The letter stated that such incursions into Cuban airspace could result in "serious consequences" for the crews and, again, Cuba appealed to the United States to adopt the necessary measures to prevent BTTR planes from violating Cuban airspace.

On February 24, 1996, three BTTR planes flew in international airspace close to Cuban territorial waters. As the planes approached Cuba, they were warned that they were "in danger" and that they were flying into an area that was "activated." Basulto, however, ignored these warnings and his plane crossed into Cuban territory. The other two planes did not enter Cuban territory but were shot down 4.8 and 9.5 miles away from Cuban territorial airspace, respectively. When the shoot down occurred, Basulto's plane was 2.1 miles into Cuban territorial airspace.

Basulto testified that at no time in his almost 2000 BTTR flights prior to

February 24th did a MiG approach BTTR planes in international airspace. He also

conceded at trial that he had been hearing the "warnings regarding the dangers of

violating Cuban airspace for a long time" and that "we knew" a consequence of

entering Cuban airspace could be a shoot down.

Within this context, we examine the evidence against Hernandez. The

Government points to three intercepted communications between the Cuban

Government and Hernandez to demonstrate the alleged conspiracy to commit

murder. The first communication was sent on January 29, 1996, two weeks after

the 500,000 leaflet dropping but before the shoot down. It is undisputed that prior

to this date, there is no evidence linking Hernandez to a murder conspiracy. The

January 29th message read:

> Superior Headquarters approved Operacion Escorpion in order to
> perfect the confrontation of [counter-revolutionary] actions of BTTR.
> Info from [Roque] and [Gonzalez] should come with clear and precise
> specifications that allow to know without a doubt that Basulto is
> flying, whether or not activity of dropping of leaflets or violation of
> air space; if [Roque] or [Gonzalez] are or are not flying, anticipated
> plan any type BTTR flights, in order to know about these activities
> ahead of time. If there is not access this should also be a priority.
> Always specify if agents are flying. . . .

The next day, the Cuban Directorate of Intelligence[1] added:

In addition report types of planes flying, registration, pilots and

---

[1] The intelligence gathering body within the Cuban government for whom the defendants worked.

91

passengers, permission for flight, day and time, altitude, distance, what type of action will be taken. If [Roque] and [Gonzalez] are asked to fly at the last minute without being scheduled find excuse not to fly. If they cannot avoid it [Gonzalez] will transmit over the airplane radio the slogan for the July 13 martyrs viva Cua and [Roque] should call his neighbor Amelia and tell her that he will call her on Wednesday. If he cannot call he should say over the radio long live Brothers to the Rescue and Democracia. . . .

The last relevant intercepted message (sent on February 18) read:

MX instructs that under no circumstances should [Roque] nor [Gonzalez] fly with BTTR or another organization on days 24, 25, 26, and 27, coinciding with celebration of Concilio Cubano in order to avoid any incident of provocation that they may carry out and our response to it. Immediately confirm when you instruct both of them. . . .

Evidence showed that Hernandez met with both Roque and Gonzalez and relayed the messages received from the Directorate of Intelligence. These three messages are the extent of the evidence that the Government presented against Hernandez relating to his knowledge and conduct prior to the shoot down of the BTTR planes.

The Government also points to three other intercepted messages that occurred after the shoot down. A communication to Hernandez from Cuban officials stated, "We have dealt the Miami right a hard blow in which your role has been decisive." One from Hernandez stated, "That the operation to which we contributed a grain of salt ended successfully." Third, the head of the Directorate

92

of Intelligence recognized Hernandez "[f]or outstanding results achieved on the job, during the provocations carried out by the government . . . this past 24th of February."

## II. Discussion

Hernandez was convicted of conspiring with the Cuban Government to commit murder in violation of 18 U.S.C. § 1117, which, inter alia, makes it a crime to conspire to violate 18 U.S.C. § 1111. Section 1111 states "(a) Murder is the unlawful killing of a human being with malice aforethought."[2]

To obtain a conviction for conspiracy, the Government must prove beyond a reasonable doubt: (1) an agreement by two or more persons to achieve an **unlawful** objective; (2) the defendant's knowing and voluntary participation in the agreement; and (3) an overt act committed in furtherance of the conspiracy. See United States v. Adkinson, 158 F.3d 1147, 1153 (11th Cir. 1998) (emphasis added). The evidence must establish a common agreement to violate the law. United States v. Parker, 839 F.2d 1473, 1478 (11th Cir. 1988). The defendant need not know that the conduct is unlawful, but the conspirators must agree to commit unlawful conduct. United States v. Feola, 420 U.S. 671, 687 (1975). Such an agreement may be proven with circumstantial evidence, but inferences are only

---

[2] Subsection (b) of that statute states both the jurisdictional requirement and the punishment for violations of subsection (a).

93

permitted when "human experience indicates a probability that certain consequences can and do follow from basic circumstantial facts." United States v. Villegas, 911 F.2d 623, 628 (11th Cir. 1990). "[C]harges of conspiracy are not to be made out by piling inference upon inference." Ingram v. United States, 360 U.S. 672, 680 (1959). "[T]he ultimate burden on the government is the ability to draw a reasonable inference, and not a speculation, of guilt." Villegas, 911 F.2d at 628. Knowledge of the criminal act "must be clear, not equivocal." See Ingram, 360 U.S. at 678-80.

Furthermore, "parties must have agreed to commit an act that is itself illegal—parties cannot be found guilty of conspiring to commit an act that is not itself against the law." United States v. Vaghela, 169 F.3d 729,732 (11th Cir. 1999). Also, the language in the substantive offense—Section 1111—states that "[m]urder is the *unlawful* killing . . ." (emphasis added). And conspiracy to commit a particular offense "cannot exist without at least the degree of criminal intent necessary for the substantive offense itself." Ingram, 360 U.S. at 680.

A country cannot lawfully shoot down aircraft in international airspace, in contrast to a country shooting down foreign aircraft within its own territory when the pilots of those aircraft are repeatedly warned to respect territorial boundaries, have dropped objects over the territory, and when the objective of the flights is to

destabilize the country's political system. Thus, the question of whether the Government provided sufficient evidence to support Hernandez's conviction turns on whether it presented sufficient evidence to prove that he entered into an agreement to shoot down the planes in international, as opposed to Cuban, airspace.

The majority opinion discusses the airspace issue, but it does so in the context of a different analytical framework: whether the *mens rea* requirement in subsection (a) of Section 1111 carries over to subsection (b). The opinion fails to address, however, whether the Government produced sufficient evidence to prove beyond a reasonable doubt that Hernandez agreed to commit an unlawful act. Such a discussion is necessary because our conspiracy law requires that those entering into a conspiracy have an agreement to commit an unlawful act and the substantive murder offense requires that the killing be unlawful. A shoot down in Cuban airspace would not have been unlawful; thus, Hernandez could not have been convicted of conspiracy to murder unless the Government proved beyond a reasonable doubt that he agreed for the shoot down to occur in international, as opposed to Cuban, airspace.[3]

---

[3] The majority opinion relies heavily on United States v. Feola, 420 U.S. 671 (1975). In that case, Feola was convicted of assaulting federal officers and conspiring to assault federal officers. Id. at 674. On appeal, Feola argued that while he and his co-conspirators agreed to an assault, they did not know that the victims of that assault were federal officers, and that, to

Here, the Government failed to provide sufficient evidence that Hernandez entered into an agreement to shoot down the planes at all. None of the intercepted communications the Government provided at trial show an agreement to shoot down the planes. At best, the evidence shows an agreement to "confront" BTTR planes. But a "confrontation" does not necessarily mean a shoot down. BTTR's videotape on January 9th clearly shows that BTTR members seriously contemplated that MiGs would "confront" them by forcing them to land. Richard Nuccio—an advisor to President Clinton on Cuban affairs—also thought BTTR's repeated violations of Cuban airspace would result in a forced landing. He testified (and documents show) that conversations within the State Department suggested the same. Id. And Basulto testified that on the day of the shoot down he thought

---

sustain his conviction, the Government had to show that he knew those victims were federal officers. Id. at 674-677. The Court disagreed. It concluded that the Government did not need to show that Feola knew that his victims were federal officers: the Government needed only to demonstrate that Feola had the intent to assault (for the substantive offense) and agreed to the assault (for the conspiracy offense). Id. at 684-85, 694-96.

Thus, the Feola opinion states that the *mens rea* required in the non-jurisdictional elements of an offense do not apply to the jurisdictional element as well. I agree that Feola controls here for the limited purpose of the *mens rea* analysis: the Government did not need to prove that Hernandez knew the shoot down would occur in international airspace within this framework because the *mens rea* in § 1111(a) is not imputed to § 1111(b). But where I disagree with the majority opinion is that I do not think the analysis stops there. The first element of conspiracy requires an agreement to commit an unlawful act, and the underlying murder statute requires that the killing be "unlawful." Within these two analytical frameworks, which are separate and distinct from the *mens rea* framework, the Government must show that Hernandez agreed to an unlawful killing—that he agreed to a shoot down in international, as opposed to Cuban, airspace. As discussed below, because there is no evidence that Hernandez agreed to such a shoot down, I dissent.

96

MiGs would fire warning shots. This evidence demonstrates the obvious: there are many ways a country could "confront" foreign aircraft. Forced landings, warning shots, and forced escorted journeys out of a country's territorial airspace are among them—as are shoot downs. But the Government presented no evidence that when Hernandez agreed to help "confront" BTTR that the agreed confrontation would be a shoot down.[4] To conclude that the evidence does show this goes beyond mere inferences to the realm of speculation.

Moreover, even assuming that Hernandez agreed to help Cuba shoot down the BTTR planes, the Government presented no evidence that Hernandez agreed to a shoot down in international airspace. It is not enough for the Government to show that a shoot down merely *occurred* in international airspace: the Government must prove beyond a reasonable doubt that Hernandez *agreed* to a shoot down in international airspace. Although such an agreement may be proven with circumstantial evidence, here, the Government failed to provide either direct or circumstantial evidence that Hernandez agreed to a shoot down in international

---

[4] The majority states that the fact that the Directorate of Intelligence did not want agents flying with BTTR on certain days shows that Hernandez knew a shoot down was going to occur. This argument assumes that the Directorate of Intelligence believed "confrontations" other than shoot downs are safe for those on board. It is just as reasonable to conclude that the Directorate of Intelligence did not want its agents flying on those days because of the dangers inherent in any confrontation involving airplanes. (Indeed, Nuccio testified that he feared a forced landing would result in a crash.) Because so much evidence points toward a "confrontation" other than a shoot down, I cannot say that a reasonable jury—given all the evidence—could conclude beyond a reasonable doubt that Hernandez agreed to a shoot down.

97

airspace. Instead, the evidence points toward a confrontation in Cuban airspace, thus negating the requirement that he agreed to commit an unlawful act.

Basulto testified that in his nearly 2000 BTTR flights, MiGs never confronted him in international airspace. Further, every communication between Cuba and the FAA discussed the consequences for invading Cuba's sovereign territory, including the letter Cuba sent on January 15th—only a month before the tragic events of February 24th. The evidence also shows that American officials at the White House and in the State Department never contemplated a confrontation in international airspace. And the intercepted communications between Cuba and Hernandez speak of a confrontation only if BTTR "provokes" Cuba. Further, the fact that the intercepted communications after the shoot down show that Hernandez was congratulated for his role and that he acknowledged participation and called it a "success" does not clearly establish an agreement to a shoot down in international airspace.[5] The Government cannot point to *any evidence* that indicates Hernandez agreed to a shoot down in international, as opposed to Cuban, airspace.

At most, the evidence demonstrates that Hernandez agreed to a confrontation

---

[5] The majority focuses on Hernandez's referring to the incident as a "success." The fact that a spy refers to a shoot down of a perceived enemy plane as a "success" is not evidence that the spy agreed to help shoot down the plane in international, as opposed to Cuban, airspace.

98

in either Cuban *or* international airspace.  But such an agreement is not enough to sustain a conspiracy conviction.  See United States v. Fernandez, 892 F.2d 976, 986 (11th Cir. 1990) (where discussion between alleged co-conspirators was susceptible to "either an illegal or legal interpretation," evidence that the conversation occurred is insufficient to meet the Government's burden to establish the unlawful-objective element of criminal conspiracy); United States v. Wieschenberg, 604 F.2d 326, 335-336 (5th Cir. 1979)[6] ("mere association of two or more persons to accomplish legal and possibly illegal goals, accompanied by discussions to promote those goals, but with no discernible direction toward either the legal or the illegal objectives" cannot support a conspiracy conviction).

I would therefore affirm Hernandez's convictions and sentences on Counts 1, 2, 4, 5, 6, 15, 16, 19, 22, 23, and 24, but I would reverse the conviction and sentence with regard to Count 3, conspiring to commit murder in violation of 18 U.S.C. § 1117.

---

[6] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.